**Clifford SMITH, et al., Plaintiff,**

v.

**COLGATE–PALMOLIVE COMPANY, Defendant.**

**No. NA 90–25–C.**

United States District Court,
S.D. Indiana,
New Albany Division.

Oct. 30, 1990.

Cecil Davenport, Louisville, Ky., Anne B. Coffman, Jeffersonville, Ind., for plaintiff.

Matthew Westfall, Raymond Haley, III, Westfall, Talbott & Woods, Louisville, Ky., James Bourne, Wyatt, Tarrant, Combs & Orbison, New Albany, Ind., for defendant.

ENTRY

BARKER, District Judge.

Before the court is the motion of the defendant, Colgate–Palmolive Company ("Colgate"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The issue is whether § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, preempts the plaintiffs' state-law tort claim of fraudulent misrepresentation. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 210–11, 105 S.Ct. 1904, 1910–11, 85 L.Ed.2d 206 (1985). After reading the briefs filed in this action and having the benefit of oral argument, the motion for

summary judgment is GRANTED for the reasons set forth below.

## MEMORANDUM

### I. *Factual Background.*

The affidavits and the exhibits filed with and in response to the motion for summary judgment reveal the following facts.

The defendant is a Delaware corporation, which does business in Indiana by way of a manufacturing facility in Jeffersonville, Indiana. The twenty-two (22) plaintiffs are former employees of Colgate in its Jersey City, New Jersey manufacturing facility.

Employees at the Jersey City facility, including the plaintiffs, were represented by a collective bargaining unit, the Employees Association of the Colgate–Palmolive Company ("Association"). Each of the plaintiffs claims to be a "vested" employee, having worked at the Jersey City facility for various periods of time ranging from five to twenty years.

Sometime in January of 1985, Colgate announced its intention to close its Jersey City facility. Consequently, Colgate and the Association negotiated a modification to the existing collective bargaining agreement. That modification was entitled *Agreement Between the Colgate–Palmolive Company and the Employees Association, Inc. of the Colgate–Palmolive Company* (the "Closure Agreement" or "Agreement"). The Agreement was entered into on March 19, 1985 and subsequently ratified by the employees. The Agreement superseded a previous collective bargaining agreement and outlined "transfer" oppor-

tunities and the rights of those "transferred" employees.

In particular, one provision of the Agreement discussed reemployment at other Colgate manufacturing facilities. Specifically, this provision provided for certain "seniority" credits for employees who were terminated by the Closure Agreement, but rehired at another Colgate facility.[1]

Sometime in March of 1987, a notice posted in the Jersey City facility announced temporary employment opportunities at the Jeffersonville plant. None of the plaintiffs, however, responded to this offer, because of the temporary nature of the employment. Later that year, on or around July 17, 1987, a different notice was posted in the Jersey City facility announcing employment opportunities in Jeffersonville.[2] Because the notice did not mention that the employment was temporary, each of the plaintiffs requested more information concerning the notice.

After individually and collectively consulting with representatives of Colgate, each of the plaintiffs decided to "terminate" his employment at Jersey City and work in the Jeffersonville facility.[3] The plaintiffs began work in Jeffersonville at various times during August, 1987. In addition to the twenty-two plaintiffs, seven employees hired from the local area began work on August 24, 1987.

The employees in Jeffersonville were also represented by a collective bargaining unit, the International Chemical Workers Union, Local 15 ("Union"). The Jeffersonville Union is wholly separate from the Association which formerly represented the plaintiffs in New Jersey. At the time the

---

1. Article VII of the Agreement stated in full: Employees who are terminated under this Agreement will, if employed at the Kansas City, Kansas or Jeffersonville, Indiana plants of the Company within six (6) months of their termination at the Jersey City plant, be given credit for Company service only for purposes of determining their eligibility for vacation and enrollment in Company benefit plans and their eligibility for benefits as provided by such plans.

2. The July notice stated in full: The Jeffersonville Plant management has notified the Jersey City Plant management of

their intention to hire additional employees in the near future.
If you are interested in applying for a transfer to the Jeffersonville Plant, please stop by the Human Resources Department, A–1–1, and pick up and complete an application.

3. In compliance with the Closure Agreement, the plaintiffs were required to terminate his employment at the Jersey City facility prior to employment at another Colgate facility. Further, the Agreement provided that the plaintiffs receive severance pay from the Colgate Company.

plaintiffs began work, the Union and Colgate had a valid collective bargaining agreement through December 1, 1988.

Once the plaintiffs began work at the Jeffersonville facility, they became members of the Union and therefore subject to the terms of the existing collective bargaining agreement. That agreement set the terms and conditions of employment for the covered employees. Part of the agreement established plantwide seniority dates for layoff and recall rights. The seniority provision provided that seniority for layoffs and re-calls was to be based on the date upon which the employee was originally hired at the Jeffersonville facility.[4] That agreement also contained a mandatory grievance and arbitration clause for disputes arising from the agreement.[5]

Approximately one year later, on August 5, 1988, as its economic fortunes continued to falter, Colgate was forced to reduce its work force at the Jeffersonville facility by twenty-nine workers. In accordance with the terms of the collective bargaining agreement, the least senior workers at the facility were laid off. These twenty-nine workers included the twenty-two plaintiffs and the seven local employees.

Shortly after being laid off, twenty of the twenty-two plaintiffs filed written grievances protesting the company's action. These grievances were filed in accordance with the procedures authorized in the collective bargaining agreement. Colgate denied those grievances, but they have not been pursued further.

Moreover, on November 4, 1988, one of the plaintiffs, Clifford Smith, filed an unfair labor practice charge alleging that he had been "unfairly discharged" by Colgate in violation of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. The Regional Director of the National Labor Relations Board dismissed the charge saying that Colgate had complied with the applicable collective bargaining contract. Thereafter, on February 8, 1989, the plaintiffs filed their complaint in diversity with this court alleging that Colgate fraudulently misrepresented the temporary nature of the Jeffersonville employment in violation of Indiana common law.

## II. *The Pleadings.*

### a. The Complaint.

The complaint alleges that Colgate induced the plaintiffs to work in the Jeffersonville plant when Colgate knew or should have known that the employment was only temporary. The plaintiffs assert that each advised Colgate that he would not move to the Jeffersonville area if the employment did not offer some degree of permanency in advancement and benefits as justified by his years of tenure with the company. The plaintiffs, prior to moving to Jeffersonville, met with representatives of Colgate in Jersey City. These representatives, it is alleged, told the plaintiffs something to the effect that the Jeffersonville employment would be permanent and they (the plaintiffs) should not worry because they would be able to retire with the company. As a result, the plaintiffs relied on these representations to their detriment by moving from New Jersey. The complaint prays for lost back and future wages, lost benefits and punitive damages in the sum of $500,000 per plaintiff.

---

4. Section 6(f) of the Jeffersonville agreement stated in part:

Plant layoffs and re-employment shall be made in accordance with plantwide seniority, consistent with the ability to perform the work required.

Section 6(g) stated in part:

Seniority rights shall be granted an employee after working thirty (30) days.

Plantwide seniority of employees with seniority rights shall be calculated from the original hiring date unless seniority is lost under Section 6(h). Plantwide seniority of employees hired the same day on or after December 1, 1982, shall be by alphabetical order (without regard for original shift assignment).

5. Article 19 of the agreement stated in part:

Should any disagreement arise between the Company and any employee or employees, members of the Union, ..., over the interpretation, performance, or application of the terms of this Agreement, it is agreed that such disagreement shall be settled in the following manner,....

b. *Response.*

The defendant answered the complaint on March 6, 1989 and thereafter moved for summary judgment and dismissal of the cause of action. The defendant bases its motion for summary judgment on Section 301 of the Labor Management Relations Act (LMRA),[6] 29 U.S.C. § 185 and its dismissal on the lack of subject matter jurisdiction due to the untimeliness of the complaint and failure to exhaust administrative remedies.

### III. *Section 301 Premption Generally.*

 Preemption under the federal labor laws occurs in three distinct contexts. See, *Paige v. Henry J. Kaiser Co.,* 826 F.2d 857, 862 (9th Cir.1987). First, *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), preemption exists to protect the original jurisdiction of the NLRB over conduct which is prohibited or protected by the National Labor Relations Act (NLRA). Second, there is preemption based on state laws and causes of action that Congress intended to leave unregulated under the NLRA. *See, Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985). Third, section 301 of the LMRA preempts any state cause of action which is based on a collective bargaining agreement or whose outcome is dependent upon an interpretation of the agreement's terms. This preemption policy exists to protect the uniform interpretation of labor contracts. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).[7]

Generally, collective bargaining agreements provide for grievance and arbitration procedures and unless an employee can show that he was not fairly represented by his union, grievance and arbitration is the employee's exclusive remedy for a breach of the agreement. To escape the exclusivity of the contractual remedies, employees frequently attempt to avoid federal law by basing their complaint on state law, disclaiming any reliance on the provisions of the collective bargaining agreement. Nevertheless, many of these cases are in fact section 301 suits and as such are governed by federal law. In such cases the "artful pleading" doctrine requires that the state law complaint be recharacterized as one arising under the collective bargaining

---

**6.** Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) provides that:

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**7.** In this case, plaintiffs' insistence on a unified theory of federal labor law preemption and their reliance on *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) is misguided.

In *Lingle,* the Supreme Court pointed out that an analysis of preemption under the NLRA and § 301 require different considerations. *Lingle,* 108 S.Ct. at 1883 n. 8. As the Seventh Circuit stated:

> so-called *Garmon* pre-emption involves protecting the primary jurisdiction of the NLRB and requires a balancing of state and federal interest.... In [section 301 preemption] the balancing of state and federal interests required by *Garmon* preemption is irrelevant, since Congress, has provided that federal law must prevail.

*Gibson v. AT & T Technologies, Inc.,* 782 F.2d 686, 689 (7th Cir.1986) *citing Allis–Chalmers.*

Moreover, in *Belknap,* the Supreme Court was asked to decide whether the NLRA preempts a state court misrepresentation and breach of contract action brought against an employer. That action was commenced by replacement workers who were displaced by reinstated strikers. The replacement workers had been offered and had accepted jobs on a permanent basis. In addition, they were repeatedly assured that they would not be fired just to accommodate returning strikers. The *Belknap* Court's analysis was grounded completely in the NLRA and relied principally on *Garmon* type preemption. Although at first blush, the facts of *Belknap* and the present case seem similar, the *Belknap* majority did not even mention section 301 preemption.

Therefore, the plaintiffs' insistence on a preemption doctrine encompassing the balancing of interests test, though correct for preemption based on the NLRA, fails to address the test used by the courts in ruling on a section 301 preemption case. As stated previously, the courts have consistently stated that the test for section 301 preemption is whether the resolution of the state law claim depends upon an interpretation of the collective agreement.

agreement and therefore subject to section 301 preemption.[8] *Olguin v. Inspiration Consol. Copper Co.,* 740 F.2d 1468, 1472 (9th Cir.1984). Moreover, in determining whether a complaint is "artfully pleaded", the court is not bound to consider only the facts pleaded in the complaint but may look elsewhere to ascertain facts that would appear in a "well pleaded" complaint. *Id.* at 1473.

Over the past five years, federal courts have been faced with the task of interpreting two Supreme Court cases ruling on section 301 preemption. The test, though easy to state, "section 301 preempts state law causes of action which require interpretation of the terms of a collective bargaining agreement," is often difficult to apply. Because the Supreme Court test lacked factual elaboration and because each application of the test necessarily turns on its unique circumstances, the courts have often come to apparently conflicting results.

In *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Supreme Court addressed the issue of whether a state law tort of bad faith delay in making disability payments was preempted by section 301. The Court held that because the right to those payments arose from the collective bargaining agreement, the state law claim was preempted. The Court used the following analysis to distinguish between claims that are preempted by, and claims that survive federal labor law:

> Our analysis must focus, then on whether the [Indiana tort action for fraudulent misrepresentation] as applied here confers nonnegotiable state law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.

471 U.S. at 213, 105 S.Ct. at 1912 (citation and footnote omitted). Accordingly, under *Allis–Chalmers,* there are two separate ways a state law claim may be preempted by section 301: 1) if the state law rights do not exist independently of the private agreements; or 2) if the evaluation of the tort claim is inextricably intertwined with the terms of the contract.

In *Allis–Chalmers,* the Supreme Court concluded that the state law tort claim was "inextricably intertwined" with the terms of the collective bargaining agreement, because the applicable collective bargaining agreement may have provided or may have precluded the relief the employee sought and because the state-law tort action would circumvent the arbitration procedures. 471 U.S. at 218–20, 105 S.Ct. at 1914–16. The Court then held that the test of "inextricably intertwined" was whether the state law claims are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." *Id.* at 220, 105 S.Ct. at 1916. If resolution of the tort claim substantially depends upon analysis of the agreement, then the state law cause of action is preempted.

In *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), the Court sought to clarify its ruling in *Allis–Chalmers.* The Court held that as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for section 301 pre-emption purposes. Thus, contrary to the Seventh Circuit's holding, a state law claim may be independent even though resolution of the dispute pursuant to the collective-bargaining agreement and state law would require addressing precisely the same set of facts. 108 S.Ct. at 1883.

In seeking to clarify its previous ruling, however, the *Lingle* court broadened the

---

**8.** Whether brought as a state or federal claim, a suit arising under a collective bargaining agreement is governed exclusively by federal law. "The preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301." *Franchise Tax Bd. of State of California v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 24, 103 S.Ct. 2841, 2854, 77 L.Ed.2d 420 (1983).

pre-emptive force of section 301. *See,* Note, *The Need for a New Approach to Federal Preemption of Union Members' State Law Claims,* 99 Yale L.J. 209 (1989). The *Lingle* test holds that preemption occurs when a plaintiff's state law claim "requires the interpretation of a collective-bargaining agreement," 486 U.S. at 413, 108 S.Ct. at 1885, whereas the *Allis–Chalmers* test required preemption when resolution of the claim "is *substantially dependent* upon analysis" of the agreement. 471 U.S. at 220, 105 S.Ct. at 1916 (emphasis supplied).

Therefore, the issue before this court is whether the plaintiffs' claim of fraudulent misrepresentation requires interpretation of either of the collective bargaining agreements covering their employment with Colgate.

### IV. *Analysis—Pre-emption.*

#### a. Section 301 Preempts the Plaintiffs' Claim.

The standards governing a motion for summary judgment are well established. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the burden of establishing the lack of a genuine issue of material fact. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984). The nonmoving party's reasonable allegations are to be accepted as true. *Yorger v. Pittsburgh Corning Corp.,* 733 F.2d 1215, 1218–19 (7th Cir.1984). However, when a properly supported motion is made, the nonmoving party "may not rest upon the mere allegations ... of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When considering a motion for summary judgment, the court must view the inferences drawn from the evidence presented in the light most favorable to the nonmoving party. *Mun-*

son v. Friske,* 754 F.2d 683, 690 (7th Cir. 1985).

As an initial matter, the plaintiffs have been rather vague in characterizing their cause of action. They continually state that this is a case of fraudulent misrepresentation, without specifying whether it is actual, negligent or constructive fraud. However, if plaintiffs base their claim on actual or negligent fraud, this case can be determined without reaching the preemption issue. Indiana does not recognize a claim of actual fraud based on promises of future performance. *Eby v. York–Division, Borg–Warner,* 455 N.E.2d 623, 628 (Ind.App.1983). Moreover, Indiana does not recognize the tort of negligent misrepresentation. *Wilson v. Palmer,* 452 N.E.2d 426 (Ind.App.1983). *See also, Pugh's IGA v. Super Food Services, Inc.,* 531 N.E.2d 1194, 1199 n. 1 (Ind.App.1988) (limiting *Eby* to its own facts).

At oral argument, counsel, without specifying the particular type of fraud, outlined the elements of the plaintiffs' cause of action. This brief outline sounded more in terms of a cause of action based on constructive fraud. In Indiana, the tort of constructive fraud consists of most of the same elements of actual fraud:

> [M]aterial representation of past or existing facts (constructive fraud includes promissory facts, too), which representations are false and cause a reliance upon such representations to the detriment of the one so relying. The major distinction between the two types of fraud is that actual fraud is intentional or reckless deception whereas constructive fraud provides a remedy on more equitable grounds.... This distinction of course, not only eliminates the element of intentional behavior from actual fraud but adds another element: in addition to finding a detriment to the promisee, we must also find an advantage to the promisor.

*Eby,* 455 N.E.2d at 628 (citations and emphasis omitted). There currently is some question in Indiana law as to whether constructive fraud may be based upon promissory misrepresentations. *See Whiteco Industries, Inc. v. Kopani,* 514 N.E.2d 840,

843 n. 3 (Ind.App.1987) (distinguishing *Eby* by stating, "in dictum [*Eby*] *erroneously* cites *Blaising* [*v. Mills*, 374 N.E.2d 1166 (Ind.App.1978)] as holding that constructive fraud may be based upon promissory misrepresentations") (emphasis supplied).

However, to the extent that it is possible to maintain a fraud action based on promissory misrepresentations, the plaintiffs have alleged and for purposes of this motion the court must find that there exist representations of promissory facts, which are false, which caused the plaintiffs to reasonably rely to their detriment and which advantaged Colgate. Nonetheless, section 301 preemption may arise if any element of plaintiffs' cause of action requires interpretation of either of the collective bargaining agreements. In particular, the issue is whether plaintiffs' required showing of reasonable reliance upon the representations of Colgate would require interpretation of the New Jersey Agreement.

At trial, plaintiffs must show that their reliance on Colgate's representations was reasonable. The asserted representations, made in July of 1987, were to the effect that the Jeffersonville employment would be permanent, i.e. that the positions would have some degree of permanency as justified by their years of tenure with the company. Underlying a reasonable reliance on these representations, however, are two provisions in the Closure Agreement entered into in March, 1985. First, one provision in the Agreement stated:

> This Agreement embodies all the terms and understandings which the Company and the Union have made with respect to the closing of the Company's plant ... and shall be binding upon the Company, the Union and all employees of the Company who are represented by the Union.

Second, there was a provision which specified that employees, re-employed at another Colgate facility within six (6) months will "be given credit for company service *only* for purposes of determining their eligibility for vacation and enrollment in Company benefit plans and their eligibility for benefits as provided by such plans." (Emphasis supplied).

For purposes of this motion, the court must determine whether a fact-finder would need to interpret the collective bargaining agreements in deciding whether plaintiffs' reliance was reasonable. In determining whether the plaintiffs' reliance was reasonable, the jury would have to put themselves in the position of an "ordinary" employee covered by the Closure Agreement and told of these representations. At a minimum, the jury would be forced to read and interpret the provisions of the Closure Agreement to determine whether a reasonable person could have relied on the representations of permanent employment knowing that an employee would "be given credit for company service only for purposes of determining their eligibility for vacation and enrollment in Company benefit plans and their eligibility for benefits as provided by such plans." It also appears that the jury would have to interpret these agreements to determine whether it is possible to reconcile the conflict between the oral representations of job security commensurate with company seniority and the terms of the Closure Agreements. Therefore, at a minimum, a referencing of the collective bargaining agreement would be required in proving plaintiffs' cause of action and that "referencing" might entail an interpretation of those provisions.

Thus, the issue is raised as to what the Supreme Court meant by "interpreting" a collective bargaining agreement? Interpretation seems to involve a determination of what the collective bargaining agreement means but not every case involves a dispute over the meaning of the terms of the agreement.

This court is mindful that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by section 301 or other provisions of the federal labor law." *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911. Although it is not clear what other courts have meant by "an interpretation of the collective bargaining agreement," the Supreme Court has stated that "if the resolution of a state-law claim depends upon the meaning of a collective-

bargaining agreement, the application of state law ... is preempted." *Lingle*, 486 U.S. at 406, 108 S.Ct. at 1881.

The First Circuit, faced with a state law claim that an employee drug testing program, implemented via a management rights clause, violated an employee's right to privacy, provides some help in determining what is meant by "interpretation." There, the court stated that:

> [O]nly by probing the contours of the Agreement can one answer whether the program was legitimately implemented under the auspices of Article XXI (the management rights clause). And Article XII (the arbitration clause) provides the only appropriate vehicle for conducting that examination. In short, assessment of [plaintiff's] allegations necessarily involves an in-depth inquiry into the rights and obligations bestowed by the Agreement. [Plaintiff's] privacy claims can only be resolved by deciding whether the employer's conduct was "reasonable" under the labor contract, taking into account the "expectations of the parties." *Allis–Chalmers*, 471 U.S. at 217 [105 S.Ct. at 1914]. This, the case law teaches, is quintessentially a matter of federal law. See, e.g., *Lingle*, 486 U.S. at 406 [108 S.Ct. at 1881].

*Jackson v. Liquid Carbonic Corp.*, 863 F.2d 111, 119 (1st Cir.1988) (footnote omitted). Later in the *Jackson* opinion, the court stated that its "duty ... is to simply decide whether the clause must be studied in order to make out the privacy claim." *Id.* at 120.

In the case at bar, the plaintiffs' fraudulent misrepresentation claims can only be resolved by deciding whether their reliance on defendant's statements was reasonable under the Closure Agreement, taking into account the expectations of the parties. Therefore, because the provisions of the Closure Agreement relating to re-employment and seniority credits must be studied to determine the issue of reasonable reliance, the plaintiffs' claim for fraudulent

misrepresentation is preempted by section 301.

Other courts faced with analogous factual situations involving misrepresentations to individual employees in a setting where a collective bargaining agreement exists have held that state law fraud claims are preempted by section 301. *See, e.g., Dougherty v. American Tel. and Tel. Co.*, 902 F.2d 201 (2nd Cir.1990); *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1049 (9th Cir.1987).

In *Dougherty*, the plaintiffs, former union employees of AT & T, brought an action in state court alleging common-law fraud and negligent misrepresentation arising from a lay-off following the divestiture of AT & T. The *Dougherty* complaint "asserted that the defendants fraudulently induced employees to transfer out of Telco [pre-divestiture company] and into ATTIS [existing company] positions by, inter alia, failing to advise employees of plans for or possibilities of work force reductions...." 902 F.2d at 203. Although the court did not mention this, it appears that there was more than just a withholding of information by AT & T. The lower court stated: "It is alleged that the plaintiffs were induced by means of booklets published by AT & T, by 'New Entities Agreements' entered into between employees and the plaintiffs' unions, and by meetings between employees and management representatives." 3 IER Cases (BNA) 478, 479 (W.D. N.Y., 1987). The Second Circuit affirmed the grant of summary judgment based on section 301 preemption.[9] The court held that the tort claims were not independent of the agreement.

> The gravamen of plaintiffs' complaint is that AT & T had various obligations to provide accurate information to employees about post-divestiture plans and projections.... Such obligations, however, are inextricably intertwined with the collective agreement governing plaintiffs' employment relationship. In anticipation of transfers resulting from the divesti-

---

**9.** The lower court had held that "any assurances purportedly made to the plaintiffs about rights, duties and expectations regarding transfers and future job conditions and opportunities can not be divorced from the contracts that gave rise to them." 3 IER Cases (BNA) at 480.

ture ... AT & T and the [Union] bargained over job assignment and transfer procedures and modified the collective agreement. Those modifications specifically contemplated layoffs while defining the employment rights of transferred employees. Plaintiffs' claims thus arise out of the precise events that caused AT & T and the [Union] to enter into the negotiations leading to the modification of the collective agreement and concern the subject matter of those negotiations.... Thus, as in *Allis-Chalmers*, it is clear that the relief sought by plaintiffs may be provided, or precluded, by the modified collective agreement, and that a state-law tort action would impermissibly circumvent the arbitration procedures of that agreement.

902 F.2d at 204.

In the case before the court, as in *Dougherty*, the complaint essentially alleges that Colgate owed the plaintiffs a duty to inform them of the nonpermanent nature of their employment. Such a duty, however, is inextricably tied to the terms of the collective-bargaining agreements. In anticipation of the Jersey City closure, Colgate and the Jersey City Association negotiated a modification agreement which provided certain rights upon reemployment at another Colgate facility. In light of the fact that plaintiffs' claims arise exactly out of the precise events that caused Colgate and the Association to negotiate the modification, they are preempted by section 301.

In *Stallcop*, the Ninth Circuit affirmed a summary judgment based on section 301 preemption of a fraud action. Stallcop alleged that following her first termination, the defendant made certain unexplained representations during the course of negotiations leading to reinstatement. After she was fired a second time, she filed a state law complaint alleging wrongful discharge, fraudulent misrepresentation, and intentional and negligent infliction of emotional distress. As to the fraudulent misrepresentation claim, the court held, *in toto*, "Stallcop's cause of action for fraud is based upon representations [the employer]

made in connection with the reinstatement agreement. As such, the fraud action depends upon an interpretation of the collective bargaining agreement, and is preempted by Section 301." 820 F.2d at 1049.

Similarly, the plaintiffs' cause of action for fraud is based upon representations Colgate made in connection with the "transfer" to Jeffersonville. "As such, the fraud action depends upon an interpretation of the collective bargaining agreement, and is preempted by Section 301." *Stallcop*, 820 F.2d at 1049.

The Seventh Circuit has also decided a section 301 preemption of a fraud action, although the facts are not as closely analogous as *Dougherty* or *Stallcop*. In *Gibson v. AT & T Technologies, Inc.*, 782 F.2d 686 (7th Cir.1986), the plaintiffs alleged that AT & T improperly deprived them of layoff allowances which were provided for in the relevant collective bargaining agreements. In lieu of being laid off, the plaintiffs elected to receive supplemental benefits. These supplemental benefits were granted pursuant to a collective agreement, however, the value of the benefits was much less than the employees would have received had they been laid off due to a plant closure.[10] After the company was forced to close its plant, less than six months later, the plaintiffs brought suit claiming that they would not have accepted the supplemental benefits had they known that the plant would close. The plaintiffs alleged that the company, at the time they offered the supplemental benefits, wrongfully withheld information from them regarding whether the company was going to shut down. The plaintiffs alleged a cause of action for willfully withholding information, which the court held was preempted by section 301. The key to the court's decision was that the plaintiffs complained about a failure to obtain a right created by the collective bargaining agreement due to the action of the defendant.

In a similar vein, the plaintiffs, in the case before the court, complain about their inability to realize rights created by the collective bargaining agreements in place

10. One plaintiff would have received $54,163 instead of the $3375 that he did receive.

in New Jersey and Jeffersonville. In particular, the plaintiffs claim that they would not have moved to the Jeffersonville area had they known that the job was not permanent. At the heart of this Agreement, however, was the ability to resign from Jersey City and be reemployed in Jeffersonville with some "seniority" rights. In as much as this right to reemployment was created in the Closure Agreement negotiated by the New Jersey Association, the plaintiffs' cause of action is preempted.

Another case with very similar facts, although decided prior to *Allis–Chalmers*, is *Moore v. General Motors Corp.*, 739 F.2d 311 (8th Cir.1984). In *Moore*, Ms. Moore brought a claim for fraud or negligent misrepresentation based upon a transfer of employment within GM divisions. Ms. Moore claims that GM falsely represented to her that she would be employed on a second shift in the new plant, when GM knew that there was not going to be a second shift. Ms. Moore, not unlike the plaintiffs in this action, claimed that the fraud occurred outside the collective bargaining agreement and therefore should not be preempted. The Eighth Circuit, however, disagreed and affirmed a summary judgment. The court held that "the tortious conduct alleged to have been committed in this case involves Moore's right of transfer to the new plant.... This right evolves from the Collective Bargaining Agreement and the Memorandum of Understanding between the Union and GM, which is governed by federal law, not state tort law." 739 F.2d at 316. Although based on preemption under the NLRA, the court did consider section 301 preemption as it was interpreted prior to *Allis–Chalmers* and determined that section 301 would also preempt this the case.

While it is true that the above referenced cases involved collective bargaining agreements which contained mandatory arbitration clauses, the court believes that the lack of arbitration procedures in the Closure Agreement is not controlling of the court's analysis. It is not controlling because the Jeffersonville Agreement, which defined the plaintiffs' employment rights when they were laid off, contains a mandatory arbitration provision. In light of the requirements of this agreement, the plaintiffs must exhaust their contractual remedies concerning their dismissal prior to filing their lawsuit. In fact, twenty of the twenty-two plaintiffs did file grievances with the company, but, for reasons not explained to the court did not pursue them beyond the initial level. One of those grievances even alleged the misrepresentations that caused him to move to Jeffersonville. Moreover, because the plaintiffs had terminated their employment in Jersey City, they could not be covered by that agreement. Therefore, since in order to resolve the issues in this action the court will be required to interpret the two agreements together and also because the Jeffersonville agreement, which governed the plaintiffs' employment at the time they were laid off, the fact that the Closure Agreement did not provide for arbitration procedures is immaterial.

### b. Plaintiffs' Claim is, in Reality, a Contract Claim.

 In the alternative, the court concludes that the crux of the plaintiffs' state law claim is a claim for breach of the individual employment contracts each negotiated with Colgate. These individual employment contracts, it is alleged, guaranteed the plaintiffs lifetime employment at the Jeffersonville facility, or at a minimum, seniority commensurate with total company service. Without a doubt, a guarantee of permanent employment or seniority transfer to these people conflicts with the collective bargaining agreement in effect at the Jeffersonville facility. A conflict between the promises to the plaintiffs and the other employees working at the Jeffersonville facility would necessarily arise because the Jeffersonville agreement specifically provided an order in which the company could lay off employees. The order of lay-off, pursuant to the Agreement, was to be determined on the basis of plantwide seniority, which was determined according to the date upon which an employee commenced work in Jeffersonville. Since these plaintiffs had individual permanent contracts,

they could not be laid off while other employees still worked, even though they had less seniority.

The Supreme Court has held that to the extent that individual contracts conflict with the collective bargaining agreement, the individual contracts are preempted. "[S]ection 301 preempts any individual labor contract inconsistent with a collective bargaining agreement in order to assure uniform federal interpretation of the collective agreement." *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911. *See also, DeLapp v. Continental Can Co., Inc.*, 868 F.2d 1073 (9th Cir.1989).

## V. *Conclusion.*

The court, having found that section 301 preempts the plaintiffs' state-law tort claim for fraudulent misrepresentation, finds that dismissal of the plaintiffs' complaint for a lack of subject matter is required. Prior to bringing a section 301 action, plaintiffs must prove that they exhausted their remedies available to them under the collective bargaining agreement. *See DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 163, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983); *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Having failed to prove that they exhausted the grievance and arbitration procedures available to them and having failed to allege any exception to the exhaustion requirement, the plaintiffs' complaint warrants dismissal. *Bailey v. Bicknell Minerals, Inc.*, 819 F.2d 690 (7th Cir.1987).

Moreover, it is well settled that an employee cannot maintain an action against his employer in a section 301 suit unless he first proves a breach of his union's duty of fair representation. *Superczynski v. P.T.O. Services, Inc.*, 706 F.2d 200, 204 (7th Cir.1983); *Cote v. Eagle Stores, Inc.* 688 F.2d 32, 35 (7th Cir.1982). Since the plaintiffs have failed to allege such a breach by the Union, Colgate's motion to dismiss must be granted. This final determination has been simplified by plaintiffs counsel's stipulation at oral argument that if the

court found section 301 preemption the plaintiffs would be out of court.

For all the foregoing reasons, the defendant's motion for summary judgment based on section 301 preemption is Granted and the complaint is Dismissed for lack of subject matter jurisdiction.

It is so ORDERED.

### JUDGMENT

In accordance with the court's accompanying entry determining that plaintiffs' state law claim for fraudulent misrepresentation is preempted based on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, JUDGMENT is hereby ENTERED in favor of the defendant and the action is hereby DISMISSED with prejudice, with each of the parties to bear its own costs.

It is so ORDERED.