943 F.2d 764
 138 L.R.R.M. (BNA) 2481, 60 USLW 2299,
120 Lab.Cas. P 10,982,
7 IER Cases 449
 Clifford SMITH, Joe Aponte, Mike Ciccone, Paul Cozine,
Gerard D'Annunzio, John Donelan, Eugene Drag, Flor Flores,
Horace Haigler, Mike Hennesey, Vera Jones, Mike Kennedy,
Klaus Kukuselis, James Mawhinney, Robert Mullins, Edward
Munn, Pablo Pardo, Edward Sheehan, Donald Smith, Jim West,
Mary Lou West, and Mike Woolford, Plaintiffs-Appellants,
v.
COLGATE-PALMOLIVE COMPANY, Defendant-Appellee.
 No. 90-3677.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 28, 1991.
Decided Sept. 18, 1991.
 
 Cecil Davenport (argued), Louisville, Ky., Anne B. Coffman, Jeffersonville, Ind., for plaintiffs-appellants.
 Matthew R. Westfall, Raymond C. Haley, III (argued), Westfall, Talbott & Woods, Louisville, Ky., James E. Bourne, Wyatt, Tarrant, Combs & Orbison, New Albany, Ind., for defendant-appellee.
 Before CUMMINGS, WOOD, Jr. and FLAUM, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Twenty-two former Colgate-Palmolive employees brought suit, alleging that their former employer had induced them to move from New Jersey to Indiana with the false promise of extended employment at its plant in Indiana. All were members of a union at a Colgate plant in New Jersey, and all joined another union when they began to work for Colgate in Indiana. Colgate moved for summary judgment on the ground that the plaintiffs' fraud claim was preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The district court granted the motion, and the plaintiffs appeal. We affirm.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 2
 The Colgate-Palmolive plant in Jersey City, New Jersey is perhaps best remembered for the 50-foot wide clock that adorned its roof and served for decades as lower Manhattan's wristwatch. In January 1985, Colgate notified the employees who worked at the plant of its intention to cease operations in Jersey City. These employees included Clifford Smith and his twenty-one co-plaintiffs, all of whom were members of a single-plant union which represented Colgate's Jersey City work force, the Employees Association of the Colgate-Palmolive Company ("Association").
 
 
 3
 On March 19, 1985, Colgate and the Association entered into a modification of their collective bargaining agreement, which was subsequently ratified by the Association's members. The agreement as modified ("the Closure Agreement") superseded the preexisting collective bargaining agreement between Colgate and the Association, and contained provisions relating to possible employment opportunities for displaced Jersey City workers at Colgate's plant in Jeffersonville, Indiana. Article VII of the Closure Agreement provided that workers who were hired at the Jeffersonville plant would "be given credit for Company service only for purposes of determining their eligibility for vacation and enrollment in Company benefit plans and their eligibility for benefits as provided in such plans." Another provision of the Closure Agreement provided that it "embodies all the terms and understandings which the Company and the Union have made with respect to the company's plant ... at Jersey City, New Jersey, and shall be binding upon the Company, the Union, and all employees of the Company who are represented by the Union."
 
 
 4
 In March 1987, Colgate posted a notice at the Jersey City plant announcing temporary employment opportunities at the Jeffersonville facility. According to the plaintiffs, they were dissuaded from applying for these positions by the temporary nature of the positions offered. In July 1987, Colgate posted a second notice at the Jersey City plant, this time advising employees that "the Jeffersonville plant management has notified the Jersey City plant management of their intention to hire additional employees in the near future" and inviting them to apply. The twenty-two plaintiffs took Colgate up on its offer after consulting individually and collectively with Colgate personnel officers. Each terminated his or her employment at Jersey City and received severance pay from Colgate. Each then moved to the Jeffersonville area and began work at the Colgate plant there in August 1987. Seven new employees Colgate hired locally also began in August.
 
 
 5
 Workers at the Colgate plant in Jeffersonville were represented by Local 15 of the International Chemical Workers Union, which is unrelated to the Association. When they started work at Jeffersonville, the plaintiffs joined Local 15 and came under the collective bargaining agreement between Colgate and the local. Section 6(f) of the collective bargaining agreement between Colgate and Local 15 ("the Jeffersonville Agreement") provided that "[p]lant layoffs and re-employment shall be made in accordance with plantwide seniority consistent with the ability to perform the work required." Section 6(g) provided that plantwide seniority "shall be calculated from the original hiring date."
 
 
 6
 On August 5, 1988, Colgate laid off twenty-nine employees at the Jeffersonville plant. Pursuant to § 6(f) of the Jeffersonville agreement, the employees with the shortest service at the plant were the ones to lose their positions. The twenty-nine employees dismissed were the twenty-two who had relocated from the Jersey City plant and the seven local employees who had also started to work at Jeffersonville in August 1987.
 
 
 7
 After being laid off, twenty of the twenty-two relocated employees filed grievances with Local 15. One of these employees, Clifford Smith, also filed an unfair labor practices charge with the local office of the National Labor Relations Board, alleging that his dismissal was an unfair labor practice in violation of paragraphs 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (a)(3). The NLRB's regional director dismissed the charge, finding that all Colgate had done was to comply with the seniority provisions of its collective bargaining agreement with Local 15.
 
 
 8
 Smith did not pursue his unfair labor practices charge. Instead, he and the twenty-one other workers who had relocated from Jersey City filed suit in district court on February 8, 1989, alleging that Colgate had induced them to move by misrepresenting that the positions at Jeffersonville would be permanent. Jurisdiction in the district court was founded on the diversity of citizenship between the plaintiffs, citizens of Indiana, Kentucky, and New Jersey, and the defendant, a Delaware corporation with its principal place of business in New York. See 28 U.S.C. § 1332(a)(1). Shortly after the suit was filed, Colgate moved for summary judgment on the ground that the fraudulent inducement claim was preempted by § 301 of the National Labor Relations Act, 29 U.S.C. § 185(a), and that the plaintiffs had abandoned any unfair labor practices claims they might have had by failing to exhaust administrative remedies provided in grievance procedures contained in the Local 15 collective bargaining agreement.
 
 
 9
 The district court granted summary judgment to defendants, Smith v. Colgate-Palmolive Co., 752 F.Supp. 273 (S.D.Ind.1990) (hereinafter "Smith" ). After reviewing the extensive body of law concerning the preemptive effect of § 301 on state-law tort and contract actions between unionized workers and their employers, the district court framed the issue before it as "whether the plaintiffs' claim of fraudulent misrepresentation requires interpretation of either" the Jersey City or Jeffersonville collective bargaining agreements. Smith, 752 F.Supp. at 278.
 
 
 10
 Looking to the elements of fraud under Indiana law, the district court reasoned that to maintain their action, the plaintiffs would have to show that they reasonably relied on Colgate's representations that the positions in Jeffersonville would be permanent. However, the question of whether their reliance was reasonable would turn on the force to be given two provisions in the Closure Agreement. These two provisions were the "merger clause" providing that the agreement represented the exclusive agreement between Colgate and the Employees' Association which represented workers at the Jersey City plant and the clause describing the limited effect the seniority rights the Jersey City workers had accrued in their prior service to Colgate would have once the workers started at Jeffersonville. "Therefore," the district court wrote, "because the provisions of the [Closure Agreement] relating to re-employment and seniority credits must be studied to determine the issue of reasonable reliance, the plaintiffs' claim for fraudulent misrepresentation is preempted by section 301." Smith, 752 F.Supp. at 280. The district court also found that the plaintiffs had failed to file their grievances with the NLRB in a timely manner and had failed to exhaust their administrative remedies, both procedural prerequisites to maintaining a § 301 action in district court.
 
 II. SECTION 301 PREEMPTION
 
 11
 On appeal, plaintiffs argue that their fraud claims are not preempted by § 301. They suggest that because the false inducements were made to individual Colgate workers, they are unrelated to the contract between the Association, on behalf of its members, and Colgate, arguing that "[m]isrepresentation[s] made to individual employees outside of a collective agreement or contract negotiation [are] not within the [NLRB's] area of concern or authority." Brief at 10. They also argue that applying § 301 preemption in this case will frustrate Indiana's interest in protecting its citizens from tortious conduct.
 
 
 12
 Defendant responds that the substantive right which the plaintiffs assert, the right to be free from layoffs, has its source in the collective bargaining agreement between Colgate and Local 15, and that the plaintiffs' relationship with Colgate was wholly created, and is defined, by the Jersey City and Jeffersonville agreements. Beyond that, defendant adopts the view of the district court that the reasonableness of the plaintiffs' reliance on the alleged misrepresentations can only be evaluated with reference to the merger clause and seniority provisions in the Closure Agreement. It also contends that the seniority provisions of the Jeffersonville Agreement must inevitably be examined in resolving the question of whether it was reasonable for the plaintiffs to move to Indiana based on whatever misrepresentations were made to them by Colgate personnel they met with in Jersey City.
 
 
 13
 It would not be implausible to read § 301 of the Labor Management Relations Act of 1947[1] as a simple jurisdictional provision which allows a federal forum for suits between labor unions or between unions and those who employ their members. The Supreme Court, however, took another path in Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), deciding there that "the substantive law to be applied in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws." Id. at 456, 77 S.Ct. at 918. Because "[t]he dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute," Teamsters v. Lucas Flour Co., 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962), "[s]tate law is [ ] 'preempted' by § 301 in that only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective bargaining agreements." United Steelworkers of Am. v. Rawson, 495 U.S. 362, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990). Furthermore, to prevent clever litigants from evading § 301's broad preemptive force by recasting contract claims as claims brought under state tort law, § 301 preempts tort claims as well, Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985), so long as the claim is one in which "state tort law purports to define the meaning of the contract relationship." Id. at 213, 105 S.Ct. at 1912.
 
 
 14
 In its frequent encounters with the issue of § 301 preemption, the Supreme Court has identified various tests to be used in determining whether a state-law contract or tort claim is barred by the rule of Lincoln Mills and its progeny that federal common law governs the relations between unions, union members, and management. See Rawson, 110 S.Ct. at 1909-10 (reviewing cases); McCormick v. AT & T Technologies, 934 F.2d 531, 539-42 (4th Cir.1991) (Phillips, J., dissenting) (same). In Lingle v. Norge Div. of Magic-Chef, the Court wrote that "the principle of § 301 preemption" was that "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is preempted and federal labor-law principles ... must be employed to resolve the dispute." 486 U.S. 399, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988). In Lueck, which like Lingle and this case involved a tort claim, the Court framed the inquiry as whether state law "confers non-negotiable rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract." 471 U.S. at 213, 105 S.Ct. at 1912.
 
 
 15
 The starting point for determining whether "the resolution of a state-law claim depends upon the meaning of a collective bargaining agreement," Lingle, 108 S.Ct. at 1881, is an examination of the state-law claim. Plaintiffs allege fraud, but on appeal argue that their claim also involves constructive fraud. The two torts share several elements:
 
 
 16
 'material misrepresentation of past or existing facts (constructive fraud includes promissory facts, too), which representations are false and cause a reliance upon such representation to the detriment of the one so relying. The major distinction between the two types of fraud is that actual fraud is intentional or reckless deception whereas constructive fraud provides a remedy on more equitable grounds by refusing to sanction behavior which procures an unconscionable advantage to one party over another regardless of intent.'
 
 
 17
 Romack v. Public Serv. Co., 499 N.E.2d 768, 778 (Ind.App. 4th Dist.1986) (Conover, J. dissenting)[2] (quoting Eby v. York Div., Borg-Warner Corp., 455 N.E.2d 623, 629 (Ind.App. 4th Dist.1983)); see also Pugh's IGA v. Super Food Servs., 531 N.E.2d 1194, 1197 (Ind.App. 4th Dist.1988). "One of the essential elements for both kinds of fraud is detrimental reliance." Craig v. ERA Mark Five Realtors, 509 N.E.2d 1144, 1147 (Ind.App. 1st Dist.1987). "In Indiana, one who relies on misrepresentations to his detriment may recover under the theory of fraud only if he had the right to rely on the misrepresentations." Captain & Co. v. Stenberg, 505 N.E.2d 88, 96 (Ind.App. 4th Dist.1987).[3]
 
 
 18
 The district court focused on the element of reasonable reliance in deciding that the resolution of the plaintiff's fraud claim would require the interpretation and application of a collective bargaining agreement. Should this case go to trial, it wrote,
 
 
 19
 the jury would have to put themselves in the position of an 'ordinary' employee covered by the Closure Agreement and told of these representations. At a minimum, the jury would be forced to read and interpret the provisions of the Closure Agreement to determine whether a reasonable person would have relied on the representations of permanent employment knowing that an employee would "be given credit for company service only for purposes or determining their eligibility for vacation and enrollment in Company benefit plans and their eligibility for benefits as provided by such plans."
 
 
 20
 Smith, 752 F.Supp. at 279. We agree that the fact finder's evaluation of reasonableness will inevitably require it to interpret the terms of the Closure Agreement, which bound Colgate and all members of the Association.
 
 
 21
 Plaintiffs contend that their fraud claim is not preempted because the alleged misrepresentations were made to them individually and collectively, not to the Association as a whole. They rely on the Supreme Court's decision in Caterpillar, Inc. v. Williams, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), which like this case involved state-law claims arising out of alleged misrepresentations upon which workers relied to their detriment. In Williams, the plaintiffs were hired to fill positions covered by a collective bargaining agreement between Caterpillar and a local of the International Association of Machinists. Subsequently, each became a managerial or salaried employee "outside the coverage of the collective bargaining agreement." 482 U.S. at 388, 107 S.Ct. at 2427. While they held these positions, Caterpillar represented to them that they would continue to be employed by the company indefinitely and that if the plant they worked at were to close they would be given positions elsewhere in the company. They were subsequently downgraded to hourly positions covered by a collective bargaining agreement, but were orally assured that this was temporary. Caterpillar subsequently closed the plant and notified the plaintiffs that they would be laid off. They brought suit in state court, under state law, claiming that Caterpillar breached employment contracts created by its representations that their relationship with their employer would continue. The Supreme Court held that these claims were not preempted by § 301 because they alleged that Caterpillar had breached "individual employment contracts," 482 U.S. at 394, 107 S.Ct. at 2430 (emphasis in original), not " 'contracts between an employer and a labor organization.' " Id. (quoting Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983)).
 
 
 22
 However, plaintiffs' emphasis on the factual similarities between Williams and this case ignores a key procedural difference between them. Williams reached the Supreme Court after the employer sought to remove the case to federal court on the ground that the state-law claim was preempted by § 301. The district court allowed Caterpillar to remove, but the Court of Appeals for the Ninth Circuit disagreed. Williams v. Caterpillar Tractor, 786 F.2d 928 (9th Cir.1986). The Ninth Circuit reasoned that because the plaintiffs relied on individual contracts of employment created by Caterpillar's representations to the plaintiffs which were separate and apart from those made to members of the Machinists local in the collective bargaining agreement, the case did not "arise under" § 301 for the purpose of determining whether the plaintiffs' suit was one "of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441. See 786 F.2d at 935-36.
 
 
 23
 In affirming the Ninth Circuit's decision, the Supreme Court, too, focused on the question of whether the plaintiffs' complaint, standing alone, called into play § 301's broad preemptive scope. In framing the analysis this way, the Court emphasized that it was doing no more than applying "the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." 482 U.S. at 392, 107 S.Ct. at 2429. Under this rule, of course, the plaintiff is "master of the claim" and "may avoid federal jurisdiction by exclusive reliance on state law." Id.
 
 
 24
 Applying the well-pleaded complaint rule to reach the conclusion that the Williams plaintiffs' state-law claims were not preempted by § 301, the Supreme Court distinguished what it described as an " 'independent corollary' " of the well-pleaded complaint rule, the doctrine of complete preemption. Under this doctrine, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." Id. at 393, 107 S.Ct. at 2430. The Court wrote that this doctrine applied only to displace "claims founded directly on rights created by collective bargaining agreements." Id. at 394, 107 S.Ct. at 2431. Because the Williams plaintiffs alleged breaches of individual contracts distinct from any collective bargaining agreement between Caterpillar and the Machinists, their claim fell outside the limited scope of the doctrine of "complete preemption."
 
 
 25
 Having disposed of complete preemption, the Supreme Court returned to the question of whether, under the well-pleaded complaint rule, plaintiffs' suit had a federal jurisdictional basis. It concluded that because the plaintiffs' well-pleaded complaint sounded entirely in state law, their suit did not arise under § 301 and could not be removed to federal court. The Court pointed out that "individual employment contracts are not inevitably superseded by any subsequent collective bargaining agreement covering an individual employee, and claims based upon them may arise under state law." 482 U.S. at 397, 107 S.Ct. at 2432 (emphasis supplied). The Court noted, however, that this did not mean that the plaintiffs' claims might not ultimately be found to be preempted. See 482 U.S. at 398, 107 S.Ct. at 2432. Rather, the § 301 preemption issue would come into the case as a defense, and "a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." 482 U.S. at 386, 107 S.Ct. at 2425; see also Franchise Tax Bd., 463 U.S. at 9-11, 103 S.Ct. at 2846-47.
 
 
 26
 For the purposes of reviewing a decision granting summary judgment to Colgate we accept that its agents misrepresented the duration of the positions at Jeffersonville in meetings with the twenty-two plaintiffs, together and separately. Had they filed suit in state court and had Colgate sought to remove the case, it is entirely possible that we would decide that removal was improper because their complaint states neither a claim arising under § 301 or a claim founded directly upon the Closure Agreement that § 301 would "completely preempt". Our inquiry in this case, however, has a different focus than the Supreme Court's attention to the "well-pleaded complaint rule" in Williams. The plaintiffs in this case chose to file their state-law claim in federal court, with jurisdiction founded on the diversity of citizenship between themselves and Colgate. In doing so, they provided a separate jurisdictional basis for their claim, making unnecessary the type of jurisdictional inquiry undertaken in Williams. In deciding whether the district court correctly awarded summary judgment to Colgate, then, we need not restrict ourselves to the question of whether this suit is properly in federal court. Rather, we can also inquire whether the plaintiffs' fraud claim is "substantially dependent on analysis of a collective bargaining agreement," International Bhd. of Elec. Workers v. Hechler, 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2167 n. 3, 95 L.Ed.2d 791 (1987), and are free to resolve this question by looking beyond the plaintiffs' complaint to the defenses Colgate asserts.[4] The defense most relevant to the preemption issue is Colgate's contention that no reasonable Jersey City employee would have relied on a representation that the positions at Jeffersonville would last given the provision in the Closure Agreement which had the effect of divesting the Jersey City workers of their seniority for purposes of layoffs. Evaluation of this defense will inevitably turn on how a finder of fact interprets the relevant provision of the Closure Agreement.
 
 
 27
 Beyond the differences in the procedural posture between this case and Caterpillar, there is a crucial factual distinction. In Caterpillar, the representations the plaintiffs argued created the terms of the contract which Caterpillar had breached were made "[d]uring the time in which the plaintiffs were employed in positions outside the bargaining unit." Williams, 786 F.2d at 930. In this case, however, not only were the alleged misrepresentations made while the plaintiffs were still covered by the Closure Agreement, but the Closure Agreement explicitly addresses the possibility that certain Jersey City workers would be offered positions at Jeffersonville, making it more likely that the resolution of this case on the merits will logically require the interpretation of the agreement. Because the interpretation of the Closure Agreement is an issue to be determined by applying the federal common law of labor agreements which § 301 creates, we agree with the district court that plaintiffs' fraud claims are preempted by § 301.
 
 III. SECTION 301 CLAIMS
 
 28
 Because we conclude that plaintiffs' sole cause of action lies under § 301, we consider whether they can maintain an action under that provision. While an individual employee may bring a § 301 action against her employer, Smith v. Evening News Ass'n, 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962), the employee is "ordinarily ... required to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement" before filing suit. DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983). To escape this requirement of administrative exhaustion, the employee must establish a breach of her union's duty of fair representation. Id. at 164, 103 S.Ct. at 2290; see Hines v. Anchor Motor Freight, 424 U.S. 554, 567, 96 S.Ct. 1048, 1057, 47 L.Ed.2d 231 (1976). No such allegation has been made here, so we agree with the district court that the plaintiffs in this case, who so far as the record reflects did not press their grievances beyond filing them with Local 15, have failed to exhaust the remedies provided in either of the two collective bargaining agreements at issue in this case.
 
 IV. CONCLUSION
 
 29
 For the foregoing reasons, the decision of the district court granting summary judgment to defendants is
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Section 301(a) of the Labor-Management Relations Act of 1947 provides:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 29 U.S.C. § 185(a).
 
 
 [2]
 Judge Conover's dissent in Romack was adopted by the Indiana Supreme Court when it reviewed the appellate court's decision. Romack v. Public Serv. Co., 511 N.E.2d 1024 (Ind.1987)
 
 
 [3]
 Because we conclude that the resolution of this case turns exclusively on the question of § 301 preemption, we express no view as to the merits of plaintiffs' fraud or constructive fraud claim
 
 
 [4]
 But see McCormick v. AT & T Technologies, 934 F.2d 531, 545 (4th Cir.1991) (Phillips, J., dissenting) (arguing that courts conducting § 301 preemption inquiry should not examine "a defendant's assertions that a labor contract's terms provide either a negating or affirmative defense," either for removal purposes or as a defense on the merits)