Albert LEONARDIS and Mario
Zecca, Plaintiffs,

v.

BURNS INTERNATIONAL SECURITY
SERVICES, INC., Defendant.

Civ. A. No. 92–2374 (AJL).

United States District Court,
D. New Jersey.

Nov. 18, 1992.

Albert Leonardis, pro se.

Sidney Altner, Edison, NJ, for plaintiff Mario Zecca.

Mary E. Tracey, Peter O. Hughes, Shanley & Fisher, P.C., Morristown, NJ, for defendant.

## OPINION

LECHNER, District Judge.

Currently before the court is the motion of defendant Burns International Security Services ("Burns") for partial summary judgment pursuant to Fed.R.Civ.P. 56(b) to dismiss the first, third and fourth counts of the complaint (the "Complaint"), filed 21 April 1992, by plaintiffs Albert Leonardis ("Leonardis") and Mario Zecca ("Zecca") (collectively, the "Plaintiffs").[1]

Jurisdiction appears to be appropriate pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185(a). For the reasons that follow, the motion for partial summary judgment is granted in its entirety.

---

**1.** In support of its motion for partial summary judgment, Burns has submitted the following: Defendant's Brief in Support of Motion for Partial Summary Judgment (the "Moving Brief"); Statement Pursuant to Rule 12(G) (the "Burns 12(G) Stmt."); Reply Brief of Defendant Burns International Security Services (the "Reply Brief").

In opposition to the Burns motion for summary judgment, Zecca has submitted the following: Plaintiff Mario Zecca's Answering Brief in Opposition to the Motion for partial Summary Judgment (the "Zecca Opp. Brief"); Statement Pursuant to Rule 12(G) (the "Zecca 12(G) Stmt.").

In opposition to the Burns motion for summary judgment, Leonardis has submitted the following: Plaintiff Albert Leonardis' Answering Brief in Opposition to the Motion for Partial Summary Judgment (the "Leonardis Opp. Brief"); Statement Pursuant to Rule 12(G) (the "Leonardis 12(G) Stmt.").

*Facts*

Burns, a New Jersey corporation with its principal place of business in Edison, New Jersey, is in the business of providing private security guard services. Burns 12(G) Stmt., ¶ 5; Complaint at 1. Plaintiffs are both residents of New Jersey. Complaint at 1. Plaintiffs were employed by Burns as security guards. Burns 12(G) Stmt., ¶ 2; Zecca 12(G) Stmt., ¶ 2; Leonardis 12(G) Stmt., ¶ 2. As employees of Burns, the Plaintiffs were also members of the Guards and Securities Local 1412 of the Laborer's International Union of North America ("Local 1412"). Burns 12(G) Stmt., ¶ 1; Zecca 12(G) Stmt., ¶ 1; Leonardis 12(G) Stmt., ¶ 1.

A collective bargaining agreement (the "Collective Bargaining Agreement") is currently in effect between Burns and Local 1412. Burns 12(G) Stmt., ¶ 3; Zecca 12(G) Stmt., ¶ 1; Leonardis 12(G) Stmt., ¶ 3. Pursuant to Article 17 ("Article 17") of the Collective Bargaining Agreement, Burns "agree[d] to assume all liability for suits brought against its employees resulting from acts committed within the scope of their employment." Burns 12(G) Stmt., ¶ 4; Zecca 12(G) Stmt., ¶ 4; Leonardis 12(G) Stmt., ¶ 4.

From 1986 until March 1991, Burns had an agreement with the New Jersey Sports and Exposition Authority (the "Sports Authority") to provide security guard services at the Meadowlands Sports Complex (the "Meadowlands"), including the Brendan Byrne Arena, located in East Rutherford, New Jersey. Complaint at 1–2; Answer (the "Answer"), filed 29 June 1992, at 1. On 28 September 1989, the Plaintiffs were working for Burns as security guards at the Meadowlands, during a hockey game. Burns 12(G) Stmt., ¶ 5; Zecca 12(G) Stmt., ¶ 5; Leonardis 12(G) Stmt., ¶ 5. During their employment, Plaintiffs and other security guards were involved in an altercation (the "Altercation") with two patrons of the Meadowlands. Burns 12(G) Stmt., ¶ 6; Zecca 12(G) Stmt., ¶ 6; Leonardis 12(G) Stmt., ¶ 6. Charges against numerous Burns security guards, including the Plaintiffs, were filed by the patrons. Zecca Moving Brief at 3.

On 14 October 1989, in an unrelated incident (the "14 Oct. 1989 Incident"), a Meadowlands patron was found dead following a Grateful Dead concert at the Meadowlands. Zecca Opp. Brief at 4; Leonardis Opp. Brief at 3. Speculation apparently followed in the news media that a Burns security guard may have been involved in the incident. Zecca Opp. Brief at 4; Leonardis Opp. Brief at 3. No one was ever arrested in connection with the 14 Oct. 1989 Incident. Zecca Opp. Brief at 4; Leonardis Opp. Brief at 3. According to Plaintiffs, the Sports Authority commenced an investigation into the manner in which Burns provided security services to the Meadowlands and, as a result of the investigation, the contract between Burns and the Sports Authority was terminated. Zecca Opp. Brief at 4; Leonardis Opp. Brief at 3.

Plaintiffs allege that, as a "ripple effect" flowing from the 14 October 1989 Incident, the Bergen County Prosecutor's office decided to vigorously pursue criminal charges against the Burns security guards involved in the Altercation. Zecca Opp. Brief at 4; Leonardis Opp. Brief at 3. In any event, in July 1990, Plaintiffs and several other guards were indicted on charges of aggravated assault and robbery under New Jersey State law. Burns 12(G) Stmt., ¶ 7; Zecca 12(G) Stmt., ¶ 7; Leonardis 12(G) Stmt., ¶ 7.

Meanwhile, on 17 November 1989, Burns issued a written memorandum (the "Burns Memo") to those employees assigned to work at the Meadowlands. Zecca 12(G) Stmt., ¶ 14; Leonardis 12(G) Stmt., ¶ 14; *see* Moving Brief, Ex. A (copy of Burns Memo). The Burns Memo recognized that "[c]urrently 10 part-time security officers are charged with aggravated assault." Moving Brief, Ex. A. It also set forth conditions for the reimbursement of attorneys' fees and related costs incurred in the defense of criminal assault charges arising out of activities in connection with employment. Zecca 12(G) Stmt., ¶ 14; Leonardis 12(G) Stmt., ¶ 14.

The Burns Memo provided that, regardless of whether an employee was charged with simple or aggravated assault, Burns would "provide a lawyer to represent [the employee] at Burns' expense, as it has in the past." Moving Brief, Ex. A. It also provided:

> Since aggravated assault charges grow out of the possible use of excessive force, your legal expenses will be paid directly by Burns up to the indictment by the Grand Jury. Upon indictment, you can retain the lawyer of your choice, and will be responsible for your legal expenses. If you are acquitted (found innocent) Burns will pay for all legal expenses incurred, unless Burns' own investigation indicates that you have violated Burns' policies and procedures.... The possible use of excessive, unnecessary and/or unreasonable force by any member of the security force cannot be tolerated.

*Id.* (emphasis deleted).

On 2 July 1990, Leonardis was notified by David Burton Brady ("Brady") that, because an indictment was forthcoming, Brady could no longer represent Leonardis in the Criminal Action.[2] Leonardis Opp. Brief, Ex. 1 (letter from Brady to Leonardis, dated 2 July 1992). Specifically, Brady stated:

> I am notifying the Criminal Case Management Office that I am no longer representing you. As I indicated during our conversation, the policy on this matter is that Burns had retained me to represent you prior to the indictment. Once an indictment has been handed down, the policy is that the guard charged must retain his own counsel. That counsel will be reimbursed for all reasonable attorneys' fees at the conclusion of the case if there is an acquittal. If not, the responsibility for payment of the fees remains with yourself. I am sure this policy has been previously explained to you by representatives of Burns.

*Id.*

On 18 April 1991, following a jury trial in Bergen County Superior Court (the "Criminal Action"), Plaintiffs were acquitted of the indicted charges but, nevertheless, were convicted of the lesser included offense of simple assault. Zecca 12(G) Stmt., ¶ 8; Leonardis 12(G) Stmt., ¶ 8; Complaint at 2. Plaintiffs appealed their convictions. Burns 12(G) Stmt., ¶ 9. The appeal by Leonardis was denied. Zecca 12(G) Stmt., ¶ 9; Leonardis 12(G) Stmt., ¶ 9. The appeal by Zecca is pending. Zecca 12(G) Stmt., ¶ 9; Leonardis 12(G) Stmt., ¶ 9.

Plaintiffs allege that, in reliance on communications and representations by Burns, they did not consider a plea bargain or accept entry into New Jersey's Pre-Trial Intervention Program (the "PTI Program") and instead chose to go to trial. Zecca Opp. Brief at 4; Leonardis Opp. Brief at 3. Certain representations do appear to have been made by Burns' representatives.

For instance, on 25 July 1990, Claude E. White ("White"), the "Vice President—Law" for Burns, notified Thomas M. Kaczka ("Kaczka"), attorney for Leonardis, that "Burns will ... reimburse Mr. Leonardis for reasonable legal fees if he is acquitted of the charges concerning the above-referenced indictment." Leonardis Opp. Brief, Ex. 3 (letter from White to Kaczka, dated 25 July 1990). Moreover, on 20 September 1990, White notified Kaczka as follows:

> [Please be advised that Burns' Policy is to reimburse Mr. Leonardis if he is acquitted. Mr. Leonardis's plea bargaining would not be an acquittal and accordingly not entitle him to reimbursement of his reasonable legal expenses.
>
> Should Mr. Leonardis enter a ... PTI Program there would be no adjudication on the merits of the charges. Therefore legal fees would not be reimbursed by Burns.]

*Id.*, Ex. 2 (Letter from White to Kaczka, dated 20 September 1990).

Subsequent to their conviction, Plaintiffs requested Burns to reimburse their legal expenses incurred in the Criminal Action.[3]

---

2. Brady had been retained as counsel for Leonardis by Burns. Leonardis Opp. Brief, Ex. 1.

3. Zecca claims to have incurred legal fees and costs in excess of fifty thousand dollars. Zecca Opp. Brief at 4. Leonardis claims to have in-

Burns 12(G) Stmt., ¶ 10; Zecca 12(G) Stmt.; ¶ 10; Leonardis 12(G) Stmt., ¶ 10. Burns refused to reimburse the Plaintiffs. Burns 12(G) Stmt., ¶ 10; Zecca 12(G) Stmt., ¶ 10; Leonardis 12(G) Stmt., ¶ 10.

On 16 September 1991 and 23 September 1991, Zecca and Leonardis respectively filed "step two" grievances (the "Step Two Grievances") under the Collective Bargaining Agreement, again seeking reimbursement of the Legal Expenses. Burns 12(G) Stmt., ¶ 11; Zecca 12(G) Stmt., ¶ 11; Leonardis 12(G) Stmt., ¶ 11; Complaint at 3. Burns denied the Step Two Grievances approximately one week later. Burns 12(G) Stmt., ¶ 12; Zecca 12(G) Stmt., ¶ 12; Leonardis 12(G) Stmt., ¶ 12; Complaint at 3. Local 1412 then refused Plaintiffs' requests to proceed to the next step of the grievance procedure. Burns 12(G) Stmt., ¶ 13; Zecca 12(G) Stmt., ¶ 13; Leonardis 12(G) Stmt., ¶ 13.

On 15 May 1992, Plaintiffs served the Complaint upon Burns. Notice of Removal ("Removal Notice"), filed 8 June 1992, ¶ 3. The Complaint alleges four counts for recovery. Count One (the "Independent Contract Claim") essentially alleges that, pursuant to the Burns Memo, Burns entered into a contract with the Burns guards at the Meadowlands, including Plaintiffs, which was independent of the Collective Bargaining Agreement. Complaint at 2. Pursuant to this alleged independent contract, Plaintiffs allege Burns was obligated to pay for the legal expenses incurred by Plaintiffs in the Criminal Action. *Id.*

Count Two alleges a claim under section 301 ("Section 301") of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185.[4] In Count Two, Plaintiffs claim Local 1412 breached its duty of fair representation owed to the Plaintiffs by "arbitrarily, capriciously, wrongfully and without just or reasonable cause, refus[ing]

to proceed to the next step of the grievance procedure." Complaint at 3.

Count Three is a claim for promissory estoppel (the "Promissory Estoppel Claim") based upon both the Burns Memo and upon the representations made by White to Plaintiffs during their trial (the "White Representations"). Plaintiffs allege the Burns Memo was "an offer to reassure its work force during a time of crisis, and [Burns] should reasonably have expected [its employees], including [P]laintiffs, to rely in a substantial nature on the offer."[5] Complaint at 4. Plaintiffs claim that, in pursuing their defense and in rejecting offers to plea bargain or enter into a PTI Program, they reasonably and detrimentally relied upon the promise of reimbursement made by Burns pursuant to the Burns Memo and the White Representations. Complaint at 4.

Count Four of the Complaint (the "Rule 4 Claim") is based on Rule 4:42–9 ("N.J.Rule 4:42–9") of the Rules Governing the Courts of the State of New Jersey (the "New Jersey Court Rules"). Complaint at 5. Plaintiffs claim that Burns' obligations, as stated in Counts One to Three, are "tantamount to an agreement for indemnification." *Id.* Thus, Plaintiffs claim, N.J.Rule 4:42–9 entitles them to reimbursement of their legal expenses incurred in the Criminal Action. *Id.*

On Counts One, Two and Three, Plaintiffs seek compensatory and consequential damages, interest and the costs of their lawsuits. Complaint at 2–4. Plaintiffs also seek declaratory relief "setting forth [Burns'] liability for all subsequent legal expenses relating to defense, appeal and post-conviction relief" in the Criminal Action. Complaint at 3–4. Count Four seeks only attorneys' fees and costs. *Id.* at 5.

As mentioned, on 8 June 1992, Burns removed the case to this court from the Superior Court of New Jersey, Law Divi-

---

curred legal fees and costs totalling almost thirty-nine thousand dollars. Leonardis Opp. Brief at 3.

**4.** Actually, Count Two does not specifically mention that the claim is brought pursuant to Section 301. Nevertheless, the parties agree that Count Two presents a Section 301 claim.

Moving Brief at 4 n. 1; Leonardis Opp. Brief at 4; Zecca Opp. Brief at 2.

**5.** Burns denies this was its motivation in issuing the Burns Memo, although it does not provide an alternative motive. *See* Answer at 4.

sion, Middlesex County, pursuant to 28 U.S.C. § 1441(a). Removal Notice, ¶¶ 1–2.

*Discussion*

### A. Summary Judgment Standard of Review

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992). While the task on a summary judgment motion is to determine whether disputed issues of fact exist, a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) (threshold inquiry is whether "there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citations omitted); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) ("summary judgment is inappropriate when a conflict on a material fact is present in the record"); *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1380 (3d Cir.1991) (summary judgment not proper "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797

(3d Cir.1990); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). " 'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.'" *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " [6] *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied*, —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e); *see also Gray*, 957 F.2d at 1078 ("there is

---

6. The Supreme Court elaborated on the summary judgment standard in *Anderson*: "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (issue of fact not created by merely questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Bldg. Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the nonmoving party fails to 'establish the existence' of an element essential to the case").

In this case, the parties concede that no material issues of fact exist with regard to the facts which underlie this litigation. Leonardis Opp. Brief at 2; Zecca Opp. Brief at 2; Moving Brief at 1. Rather, the dispute between the parties rests entirely upon questions of law. First, the parties dispute whether, on the facts alleged in the Complaint and argued by Plaintiffs in the motion papers, Plaintiffs' Independent Contract Claim and Promissory Estoppel Claim are preempted by Section 301 of the LMRA. The parties also dispute whether the Rule 4 Claim, which arises from the New Jersey Court Rules, is (1) a claim cognizable in federal court and (2) a provision creating substantive rights or simply a rule of procedure.

Because these disputes center on purely legal rather than factual interpretations, the case is a particularly appropriate candidate for summary judgment analysis. *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 439 (3d Cir.1982); *Peterson v. Lehigh Valley Dist. Council, etc.,* 676 F.2d 81, 84 (3d Cir.1982); *United States v. 294 Various Gambling Devices,* 718 F.Supp. 1236, 1242 (W.D.Pa.1989); *see also Gans v. Mun-*

*dy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment proper where facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *McKinney v. Board of Trustees of Mayland Commun. College,* 955 F.2d 924, 928 (4th Cir.1992) ("summary judgment should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into facts is not necessary to clarify the application of the law"); *Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 176 (5th Cir. 1991) ("summary judgment is appropriate where only issue before court is a pure question of law"); *Crain v. Board of Police Comm'rs of Metro. Police Dep't,* 920 F.2d 1402, 1405–06 (8th Cir.1990) (when "unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate").

■ Indeed, not only are questions of Section 301 preemption frequently resolved on motions for summary judgment but, when such preemption exists, it is appropriate to grant summary judgment. *See Smith v. Colgate–Palmolive Co.,* 943 F.2d 764 (7th Cir.1991); *Jones v. General Motors Corp.,* 939 F.2d 380 (6th Cir.1991); *Stikes v. Chevron USA, Inc.,* 914 F.2d 1265 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2015, 114 L.Ed.2d 101 (1991); *Berda v. CBS, Inc.,* 881 F.2d 20 (3d Cir. 1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *Vacca v. Viacom Broadcasting of Missouri, Inc.,* 875 F.2d 1337 (8th Cir.1989); *Bache v. American Tel. & Tel.,* 840 F.2d 283 (5th Cir.), *cert. denied sub nom., Bankston v. American Tel. & Tel. Co.,* 488 U.S. 888, 109 S.Ct. 219, 102 L.Ed.2d 210 (1988); *White v. National Steel Corp.,* 742 F.Supp. 312 (N.D.W.Va.1989), *aff'd in part & rev'd in part,* 938 F.2d 474 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 454, 116 L.Ed.2d 471 (1991); *Cole v. Pathmark of Fairlawn,* 672 F.Supp. 796 (D.N.J.1987); *Kern v. United Steelworkers of America, Local 1688,* 669 F.Supp. 701 (M.D.Pa.1987); *see also Barton v. Creasey Co. of Clarksburg,* 718 F.Supp. 1284 (N.D.W.Va. 1989) (resolving Section 301 preemption question on motion to dismiss), *aff'd,* 900

F.2d 249 (4th Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990).

## B. Preemption Under Section 301 of the Labor Management Relations Act

Section 301 of the LMRA, 29 U.S.C. § 185(a), provides:

Suits for violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

*Id.*

■ A suit brought by an individual employee against his employer for breach of a collective bargaining agreement is among the class of cases that falls within the purview of Section 301. *Cole*, 672 F.Supp. at 799 (citing *Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962)). As this Circuit has explained:

Although [S]ection 301 refers only to suits between employers and unions, and does not explicitly mention suits between employers and employees, the Supreme Court has read this provision to create federal jurisdiction over all claims that are substantially dependent upon analysis of the terms of a collective bargaining agreement [ ("CBA")][7], regardless of

whether the claim is brought by a union or directly by an employee.

*Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1536 n. 5 (3d Cir.1992) (citing *Allis–Chalmers v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Griesmann v. Chemical Leaman Tank Lines, Inc.*, 776 F.2d 66 (3d Cir.1985)).

■ Section 301 provides not only for federal jurisdiction over claims related to a CBA, but also for exclusive jurisdiction over such claims. Although Congress has never explicitly indicated the extent to which it intended to preempt state law, *Cole*, 672 F.Supp. at 800, the Supreme Court has discussed the preemptive effect of Section 301.[8] In *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), the Court explained:

[P]etitioner's action "arose under" [Section] 301, and thus could be removed to federal court, although the petitioner had undoubtedly pleaded an adequate claim for relief under the state law of contracts and had sought a remedy available only under state law.... [T]he pre-emptive force of [Section] 301 is so powerful as to displace entirely any state cause of action "for violation of contracts between an employer and a labor organization." Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of [Section] 301.

*Id.* at 23, 103 S.Ct. at 2853 (citing and discussing *Avco Corp. v. Aero Lodge No. 735, etc.*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126, *reh'g denied*, 391 U.S. 929, 88 S.Ct. 1801, 20 L.Ed.2d 670 (1968); *see also Angst*, 969 F.2d at 1536 ("Supreme Court precedent unequivocally instructs us to resolve disputes concerning collectively bar-

---

**7.** "CBA" is used in this Opinion to define the term "collective bargaining agreement" in its general sense, as opposed to the specific CBA in this case which has been defined as the Collective Bargaining Agreement.

**8.** Congress' power to preempt state law is derived from the Supremacy Clause of Article IV of the United States Constitution. *Allis–Chalmers*, 471 U.S. at 208, 105 S.Ct. at 2572 (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 6 L.Ed. 23 (1824)). Although Congressional power to

legislate in the area of labor relations is well-established, "Congress ... has never exercised authority to occupy the entire field of labor legislation." *Allis–Chalmers*, 471 U.S. at 208, 105 S.Ct. at 2572 (citing *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) and *Amalgamated Ass'n of Street, etc. v. Lockridge*, 403 U.S. 274, 289, 91 S.Ct. 1909, 1919, 29 L.Ed.2d 473, *reh'g denied*, 404 U.S. 874, 92 S.Ct. 24, 30 L.Ed.2d 120 (1971)).

gained labor agreements pursuant to federal law rather than state law."); *Berda*, 881 F.2d at 22 ("when a suit stating a claim under [S]ection 301 is brought, state contract law is displaced").

■ The purpose of preempting state contract law with a uniform federal law is "to allow [parties to CBAs] to have some certainty as to the way that agreement will be construed by courts."[9] *Berda*, 881 F.2d at 22. As the Supreme Court has stated:

> [T]he subject matter of [Section] 301 "is peculiarly one that calls for uniform law." ... The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might some day be invoked in enforcing the contract. Once the collective bargain was made, the possibility of competing legal systems would tend to stimulate and prolong disputes as to its interpretation ... [and] might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.[10]

*Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co.*, 369 U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962); *see also Allis–Chalmers*, 471 U.S. at 210, 105 S.Ct. at 1910.

In *Allis–Chalmers Corp.*, the Supreme Court established a guideline in determining whether Section 301 preemption should

apply. 471 U.S. at 220, 105 S.Ct. at 1915. The Court stated:

> [W]hen resolution of a state-law claim is *substantially dependent* upon analysis of the terms of a [CBA], the claim must be treated as a [Section] 301 claim ... or [be] dismissed as pre-empted by federal labor-contract law.

*Id.* at 220, 105 S.Ct. at 1916 (citation omitted) (emphasis added). The Court further stated:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law....

*Id.* at 211, 105 S.Ct. at 1911.

On subsequent occasions, the Court has refined its Section 301 jurisprudence. In *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), for instance, the Court recognized that "Section 301 governs claims founded directly upon rights created by [CBAs], and also claims 'substantially dependent on analysis of a CBA.'" *Id.* at 394, 107 S.Ct. at 1875 (citing *I.B.E.W. v. Hechler*, 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 2167 n. 3, 95 L.Ed.2d 791 (1987)); *see also Lingle*, 486 U.S. at 405–06, 108 S.Ct. at 1881.

The Supreme Court has also indicated that "not every dispute concerning employment, or tangentially involving a provision of a [CBA], is pre-empted by [Section] 301." *Berda*, 881 F.2d at 23 (citing *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911). "Section 301 on its face says nothing about the substance of what private parties may

---

9. The Supreme Court has held, however, that state courts have concurrent jurisdiction over Section 301 claims although they must apply federal law when deciding those claims. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403 n. 2, 108 S.Ct. 1877, 1880 n. 2, 100 L.Ed.2d 410 (1988); *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

10. The Supreme Court has also held that Section 301 preemption extends beyond contract claims and reaches certain claims sounding in tort. *See Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911.

agree to in a labor contract. Nor is there any suggestion that Congress, in adopting [Section] 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulations." *Allis–Chalmers,* 471 U.S. at 212, 105 S.Ct. at 1912; *accord Caterpillar,* 482 U.S. at 394–95, 107 S.Ct. at 2430–31.

In *Lingle,* 486 U.S. 399, 108 S.Ct. 1877, the Court further explained:

> [E]ven if dispute resolution pursuant to a [CBA], on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for [Section] 301 preemption purposes.

*Id.* at 409–410, 108 S.Ct. at 1883. Thus, claims bearing no relationship to a CBA "beyond the fact that they are asserted by an individual covered by such an agreement are simply not pre-empted by [Section] 301." *Caterpillar,* 482 U.S. at 396 n. 10, 107 S.Ct. at 2431 n. 10. Similarly, Section 301 will not preempt "state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." [11] *Allis–Chalmers,* 471 U.S. at 212, 105 S.Ct. at 1912.

### 1. The Independent Contract Claim

The first count of the Complaint "seeks recovery on a theory of direct and implied contract between [Plaintiffs] and [Burns] on the subject of reimbursement of attorney's fees." Zecca Opp. Brief at 6. Plaintiffs argue this claim is not preempted by Section 301.[12] *Id.* at 6–7; Leonardis Opp. Brief at 4–5. As Zecca states:

> [T]his [claim] is separate and distinct from the theory of relief relied upon in the Second Count [*i.e.* the Section 301 Claim]. The former seeks enforcement of rights emanating from a direct agree-

ment between plaintiffs and defendant, which stands independent from the [C]ollective [B]argaining [A]greement.

Zecca Opp. Brief at 6–7. Plaintiffs argue the Burns Memo established an independent "attorney reimbursement commitment." *Id.* at 7; Leonardis Opp. Brief at 4–5. This alleged commitment was evidenced by the fact that "such agreement was adhered to by defendant in instances involving other employees." *Id.*

In opposition, Burns argues that determination of the Independent Contract Claim "necessarily requires the court to analyze the terms of the Collective Bargaining Agreement to determine its meaning." Moving Brief at 5–6. Therefore, according to Burns, the Independent Contract Claim is preempted by Section 301. *Id.*

As indicated by the previously-discussed Supreme Court cases, Section 301 preemption is appropriate in two circumstances. First, Section 301 will preempt state claims when the independent contract claims are founded directly on rights created by a CBA. *Gulden v. Crown Zellerbach Corp.,* 890 F.2d 195, 198 (9th Cir. 1989); *Stikes,* 914 F.2d at 1268; *Gaddis v. Orgulf Transp. Co.,* 680 F.Supp. 1279, 1286 (S.D.Ill.1988).

Second, where the right is created by state law, a claim based on that right is preempted if the application of state law requires the interpretation of a CBA. *Gulden,* 890 F.2d at 198; *Jackson v. Southern California Gas Co.,* 881 F.2d 638, 643 (9th Cir.1989); *see also Cook v. Lindsay Olive Growers,* 911 F.2d 233, 237 (9th Cir.1990) ("pre-emption is required if ... claims can be resolved only by referring to the terms of the agreement"). Stated differently, state claims that depend substantially on an analysis of a CBA are preempted by Section 301. *Angst,* 969 F.2d at 1536; *Chmiel v. Beverly Wilshire Hotel Co.,* 873 F.2d 1283, 1285 (9th Cir.1989).

---

**11.** A plaintiff can even assert legal rights based on "state law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement." *Caterpillar,* 482 U.S. at 396, 107 S.Ct. at 2431.

**12.** The Leonardis Opp. Brief contains no citations to case law and, beyond mere allegations that Plaintiffs' claims are not preempted, contains almost no legal analysis. The Zecca Opp. Brief is considered to contain both Plaintiffs' legal arguments.

■ Despite Plaintiffs claims to the contrary, case law dictates that Section 301 preemption is appropriate on the Independent Contract Claim. As previously stated, Article 17 provides:

> [Burns] further agrees to assume all liability for suits brought against its employees resulting from acts committed within the scope of their employment.

*Id.* The Collective Bargaining Agreement appears to create a general right to reimbursement of legal costs. Plaintiffs' Independent Contract Claim merely attempts to apply this general right to reimbursement to such specific costs as attorneys fees.[13] Plaintiffs, in fact, argue that Article 17 provides for the reimbursement of attorneys' fees. Zecca Opp. Brief at 7; Leonardis Opp. Brief at 5. By Plaintiffs' own admission, the Independent Contract Claim is founded directly on a right created by the Collective Bargaining Agreement. The preemptive effect of Section 301 is implicated.[14] *Caterpillar*, 482 U.S. at 394, 107 S.Ct. at 2430; *Stikes*, 914 F.2d at 1268; *Gulden*, 890 F.2d at 198; *Gaddis*, 680 F.Supp. at 1286.

This result is consistent with the case law in the area. For instance, in *Kern*, 669 F.Supp. 701, the court refused to enforce a state law claim for breach of an oral contract, pursuant to which it was alleged plaintiff had been promised increased seniority rights. *Id.* at 704. The court stated:

> Seniority and its accumulation is an express term of the collective bargaining agreement in the instant case. Plaintiff's reinstatement, therefore, could only be governed by the terms of that agreement, not by the terms of the oral contract, even if the seniority terms are identical. Plaintiff cannot sue, therefore to enforce the seniority term if the oral contract. . . .

*Id.*

A similar situation was present in *Jones*, 939 F.2d 380, a case involving a state law claim for breach of an alleged settlement agreement. *Id.* at 382. The *Jones* court recognized that, even though resolution of the claim would not involve "the direct interpretation of a precise term of the CBA," preemption was appropriate because resolution "will require a court to address relationships that have been created through the collective bargaining process and to mediate a dispute founded upon rights created by a CBA." *Id.* at 382–83; *see also Barton*, 718 F.Supp. at 1288 (claim for unpaid vacation benefits brought under state statute was preempted when CBA contained express provision for payment of vacation benefits).

■ Section 301 preemption is also appropriate because, even if the Burns Memo creates different reimbursement rights than the Collective Bargaining Agreement, a determination of Plaintiffs' reimburse-

---

**13.** The Supreme Court recognized in *Avco* that, when the "heart" of a state law complaint is a clause in the CBA, the complaint arises under federal law. 390 U.S. at 558–60, 88 S.Ct. at 1236–37. Preemption under such circumstances is appropriate. *Jackson*, 881 F.2d at 642 (citing *Avco*, 390 U.S. at 558–60, 88 S.Ct. at 1236–37); *White*, 742 F.Supp. at 318 (same).

**14.** Zecca argues that because "attorney fee reimbursement is not an express term of the [C]ollective [B]argaining [A]greement," the Independent Contract Claim deals with separate and distinct rights. Zecca Brief at 13–14. Similarly, Leonardis argues that the 17 November 1989 Memorandum "grants rights to plaintiffs outside of [the C]ollective [B]argaining [A]greement. Leonardis Opp. Brief at 5.

These arguments are meritless. Simply because "attorney fee reimbursement" is not an "express term" of the Collective Bargaining Agreement does not mean that separate rights are created by the Independent Contract Claim. Article 17 is fashioned in general terms which provide that Burns agrees "to assume liability for suits brought against its employees." *See* Leonardis Opp. Brief at 5. Whether this provision creates a right to attorneys' fees is not clear. Indeed, Zecca contradicts himself by conceding that the reimbursement of attorneys' fees "may be present by implication" in Article 17. Zecca Opp. Brief at 14.

In any event, even if the independent rights argument is granted, determining what those independent rights are requires analysis of the Collective Bargaining Agreement as a whole, as well consideration of the intent behind Article 17 and the way it has been applied in practice, given the fact that Article 17 is drawn in such broad terms. *See infra* at pp. 1176–1178. As such, preemption is appropriate under Section 301.

ment rights cannot be made without extensive analysis of Article 17 and the Collective Bargaining Agreement. Plaintiff Zecca, in effect, concedes this when, after quoting the text of Article 17, he states:

Although plaintiffs are relying on this language as spawning their right to reimbursement of attorneys' fees and related expenses, *arguably* the above language may be *ambiguous* and not supportive of plaintiffs' claim in this regard. Accordingly, alternate theories of relief have been pleaded in Counts One and Three. *One might contend that the Article 17 Language is speaking in terms of indemnification against judgments, but that it does not go so far as to also include attorney's fees and costs. Furthermore, it is also arguable that this language was only intended to offer protection to employees who are targets of a civil suit and not a criminal prosecution,* as underlies plaintiffs' claims herein.

Zecca Opp. Brief at 7–8 (emphasis added); *see also* Leonardis Opp. Brief at 5 (conceding that Plaintiff's Independent Contract and Promissory Estoppel Claims "rely" on the Collective Bargaining Agreement).

The admitted ambiguity of Article 17 is significant. To determine where Plaintiffs' reimbursement rights under Article 17 end, and where additional rights, if any, under the Burns Memo begin, there must be examination of (1) Article 17 and its relation to the Collective Bargaining Agreement as a whole, (2) the intent of the parties in drafting Article 17 and (3) the actual practice of Burns with regard to the reimbursement issue.[15]

As the Supreme Court stated in *Allis–Chalmers:* "Questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law." 471 U.S. at 211, 105 S.Ct. at 1911. Moreover, cases have specifically stated that Section 301 preemption arises "when a state-based claim requires examining the practices and customs of a workplace whose conditions are governed by a CBA." *Jones,* 939 F.2d at 383; *Ulrich v. Goodyear Tire & Rubber Co.,* 884 F.2d 936, 938 (6th Cir.1989); *see also United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract ... the practices of the industry and the shop—is equally a part of the [CBA] although not expressed in it.").

Even if the Burns Memo does grant Plaintiffs additional reimbursement rights, those rights are "inextricably entwined" with Article 17 and "depend substantially" on analysis of the Collective Bargaining Agreement.[16] For this reason as well, Section 301 preemption is appropriate. *Allis–Chalmers,* 471 U.S. at 211, 220, 105 S.Ct. at 1352; *see also Lingle,* 486 U.S. at 405–06, 108 S.Ct. at 1881; *Angst,* 969 F.2d at 1536; *Cook,* 911 F.2d at 237; *Gulden,* 890 F.2d at 198; *Jackson,* 881 F.2d at 643; *Chmiel,* 873 F.2d at 1285.

This result is also consistent with the case law in this area. In *Vacca,* 875 F.2d 1337, a state law contract suit over the payment of tuition assistance ("TAP") benefits, plaintiff claimed to have "a side agreement [that was] separate and distinct" from the collective agreement. *Id.* at 1342. Pursuant to this side agreement,

15. There is no question that Burns had developed an actual practice with regard to Article 17. Not only do Plaintiffs argue that the practices of Burns are relevant, *see* Zecca Brief at 4–5, but also the Burns Memo recognizes that Burns would "provide a lawyer to represent [the employee] at Burn's expense, *as it has in the past."* Moving Brief, Ex. A.

16. Zecca points to numerous facial distinctions between the general terms of Article 17 and the specific provisions of the Burns Memo. Zecca Opp. Brief at 8. For instance, Zecca notes the Collective Bargaining Agreement is neither limited to criminal cases nor does it require innocence on any criminal charges. *Id.* These distinctions in language do not support Plaintiffs' Independent Contract Claim. Instead, they emphasize the need to consult the Collective Bargaining Agreement as a whole, as well as the intent and practice associated with Article 17, to determine with specificity what is covered by Article 17's general language.

plaintiff claimed he was entitled to increased TAP benefits. *Id.* The *Vacca* court rejected this claim on the ground of Section 301 preemption. *Id.* at 1342–43. The court stated that, "[i]f nothing else," determination of whether TAP was part of the CBA "required" interpretation of the relevant CBA provision and, therefore, preempted the state claim. *Id.* at 1343.

Similarly, in *Riccio v. Prudential Ins. Co.*, No. 92–2195, 1992 WL 281159, 1992 U.S.Dist.LEXIS 15434 (D.N.J. 21 September 1992), the court found that claims arising from breach of an alleged independent agency agreement were preempted by Section 301. *Id.*, 1992 WL 281159 at **2–3, 1992 U.S.Dist.LEXIS 15434 at **3–4. The court held that, because the subsequently-passed CBA modified certain portions of those agency agreements, resort to the CBA was necessary to resolve plaintiff's claims. *Id.*, 1992 WL 281159 at **2–3, 1992 U.S.Dist.LEXIS 15434 at **4–5.

The most recent decision from the Circuit on the issue of Section 301 preemption, *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, is particularly applicable to the present case. In *Angst*, the court found preemption on facts similar to those in the present case. *Angst* involved a "buy-out" agreement (the "Buy–Out Agreement") whereby Mack Trucks ("Mack") agreed to pay a lump sum of seventy-five thousand dollars and one year of continued benefits to the sixty-nine most senior employees to voluntarily leave the company. *Id.* at 1532. The Buy–Out Agreement purported to modify the CBA then governing Mack's employees.[17] *Id.* The CBA contained its own layoff provisions for Mack employees. *Id.* at 1536.

The union held a meeting at which it presented the Buy–Out Agreement to its members. *Id.* at 1532. The union, however, did not inform its members of the sixty-nine employee limit because "it ... feared that such disclosure might discourage some employees from applying." *Id.* at 1532 & n. 1. Instead, the union actually implied that the Buy–Out Agreement was available to all employee applicants. *Id.* at 1532–33. This representation was repeated at a second informational meeting held two days later. *Id.* at 1533. Ultimately, when one hundred forty-four employees applied for the buy-out, a significant number of applications were denied. *Id.*

Eighteen applicants brought suit in federal court, contending that Mack had breached its contractual obligation under the Buy–Out Agreement to provide each of them with the agreement's stated benefits. *Id.* The district court rejected Section 301 preemption and directed a verdict in favor of the employees on their state law contract claim. *Id.* The district court specifically held that Mack had entered into and breached individual contracts of employment with the plaintiffs. *Id.*

On appeal, the Circuit vacated this portion of the district court's decision and held that the employees' state contract claims were preempted by Section 301. *Id.* at 1537, 1541. In finding Section 301 preemption, the *Angst* court stated:

> The district court purported to resolve the dispute between the employees and Mack without examining or interpreting any of the [CBAs] between Mack and union. However, ignoring those agreements displaces the role that unions play as the exclusive lawful representatives of their members.[18] ... In the context of the buy-out plan negotiations, therefore, Mack could bargain only with the union and not with the individual employees concerning a modification of the

---

**17.** Although this agreement was negotiated with union representatives, it was not voted upon by the rank and file union members and thus did not become a part of the CBA. *Angst*, 969 F.2d at 1532.

**18.** Section 9(a) of the LMRA provides:
Representatives designated or selected for the purposes of collective bargaining by the ma-

jority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. 29 U.S.C. § 159(a); *see also Angst*, 969 F.2d at 1536.

CBA's layoff provision—a provision constituting a condition of employment.[19] *Id.* at 1536. The *Angst* court further explained: "It is clearly apparent that such a violation as the employees allege, if one occurred, cannot be identified without resort to, and examination of, Mack's CBA and any of its modifications." *Id.* at 1537.

*Angst* dictates that Plaintiffs' Independent Contract Claim must be dismissed as preempted by Section 301. As in *Angst,* the violation alleged by Zecca and Leonardis "cannot be identified without resort to, and examination of" the Collective Bargaining Agreement. *Id.* More importantly, because the Collective Bargaining Agreement provides for the reimbursement of legal fees, reimbursement constitutes a "condition of employment" for *all* security guards who are employed by Burns and belong to Local 1412. As such, the Meadowlands guards in general, and Plaintiffs in particular, could not enter into a separate contract with regard to reimbursement rights. Indeed, to interpret the Burns Memo as providing for a separate right to reimbursement for only those Burns security guards stationed at the Meadowlands[20]—as Plaintiffs assert, *see* Zecca Opp. Brief at 9, 12—would, as in *Angst,* "displace[ ] the role that unions play as the exclusive lawful representatives of their members." *Angst,* 969 F.2d at 1536.

*Angst* is only one of a number of cases that have found Section 301 preemption in these circumstances. *See, e.g., Chmiel,* 873 F.2d at 1286 (when independent contract claim "concerns a job position governed by the [CBA], it is completely preempted by [S]ection 301"); *White,* 742 F.Supp. at 319 (Section 301 preemption applicable when terms of alleged contractual claim relate to terms of employment in union position and matter is addressed in CBA); *see also Vacca,* 875 F.2d at 1342 (whether employee could negotiate more favorable side agreement with employer was itself question that required resort to CBA and warranted finding of Section 301 preemption). For this third reason, then, Plaintiffs' Independent Contract Claim is preempted by Section 301.

Zecca asserts that "the rights of an employee with respect to his employer do not begin and end with the collective bargaining agreement" and that employees have rights "to enter into private agreements with their employer provided they are not in conflict with any applicable union agreement." Zecca Opp. Brief at 9. In support of this contention, Zecca cites *Caterpillar,* 482 U.S. 386, 107 S.Ct. 2425, *Berda,* 881 F.2d 20 and *Malia v. RCA Corp.,* 794 F.2d 909 (3d Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3210, 96 L.Ed.2d 696 (1987). Zecca Opp. Brief at 9–10 n. 2. Zecca also relies generally on *Lingle,* 486 U.S. 399, 108 S.Ct. 1877 and *Allis–Chalmers,* 471 U.S. 202, 105 S.Ct. 1904. Zecca Opp. Brief at 10. As discussed below, these cases do not support Plaintiffs' Independent Contract Claim.

In *Caterpillar,* the Supreme Court held that Section 301 did not preempt a state law contract suit in which the plaintiffs, who were union members, alleged that their employer breached individual employment agreements that pre-dated their joining the union. 482 U.S. at 388–89, 107 S.Ct. at 2427–28. Because the employment contracts pre-dated plaintiffs' participation as union members, the Court found that the individual contracts were not "substantially dependent upon interpretation of the

---

**19.** The idea that employees of a collective bargaining unit are bound by the terms of their CBA is well established. The Supreme Court stated in *N.L.R.B. v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 *reh'g denied,* 389 U.S. 892, 88 S.Ct. 13, 19 L.Ed.2d 202 (1967):

> [The national labor policy] extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.... The

employee may disagree with many of the union decisions but is bound by them.

*Id.,* 388 U.S. at 180, 87 S.Ct. at 2006; *see also Riccio,* 1992 WL 281159 at \*3, 1992 U.S.Dist. LEXIS 15434 at \*4.

**20.** Zecca actually argues that the independent reimbursement offer was "aimed with particularity at reassuring those ten employees, including Messrs. Leonardis and Zecca, ... already facing criminal charges." Zecca Opp. Brief at 12.

[CBA]" and did not "rely upon the [CBA even] indirectly." *Id.* at 389, 107 S.Ct. at 2428.

In *Berda v. CBS, Inc.*, 881 F.2d 20, CBS had promised Berda at a pre-hiring meeting that he would be guaranteed permanent employment with CBS. *Id.* at 21. Based on this representation, Berda took a job with CBS and moved from Washington, D.C. to Pennsylvania. *Id.* at 20–21. Upon commencing work, Berda joined the union. *Id.* at 21. Within five months, Berda was laid off. *Id.* Berda thereafter brought suit against CBS, alleging alternatively breach of contract or promissory estoppel, and tortious misrepresentation. *Id.*

Despite arguments by CBS that Section 301 preempted Berda's contract and promissory estoppel claims, the *Berda* court found no preemption. In discussing Supreme Court jurisprudence with regard to Section 301, the court recognized that the Supreme Court has not held that "individual contracts more advantageous to the employee than the collective agreement are subsumed by the collective agreement." *Berda,* 881 F.2d at 24 (citing *J.I. Case Co. v. N.L.R.B.*, 321 U.S. 332, 339, 64 S.Ct. 576, 581, 88 L.Ed. 762 (1944)). Relying heavily on *Caterpillar,* the *Berda* court concluded that, because Berda's claims were premised on a pre-employment agreement, the complaint was not substantially dependent upon interpreting a CAB and the contract and promissory estoppel claims were not preempted. *Berda,* 881 F.2d at 26.

Section 301 preemption was also considered in *Malia,* 794 F.2d 909. Malia, an employee of RCA and a member of a collective bargaining unit, was offered a promotion by RCA to a job outside of the bargaining unit. *Id.* at 911. As an inducement, Malia was made a number of promises, including the option of returning to the bargaining unit if he was not satisfied with his new position. *Id.* In less than three weeks, when Malia requested a return to his old position, RCA refused the reassignment request. *Id.* Malia brought suit alleging, *inter alia,* breach of oral contract and fraudulent misrepresentation. *Id.* at 910.

In a divided panel decision, the *Malia* court found that the right requested by Malia was separate from the right established by the CBA. *Id.* The *Malia* court stated:

> Although Malia was a member of [the union] when he negotiated the alleged oral contract, the oral contract relates to the job of inventory supervisor—a management position outside the [union]. Nothing in the LMRA prevents an individual—whether that individual is to be newly hired or promoted from a bargaining unit—from negotiating an employment contract for a management position. Nor does the LMRA prevent an individual—whether an applicant for new employment or a current employee in a supervisory position—from negotiating for a job in a bargaining unit so long as that employment will be on the terms and conditions set forth in collective bargaining agreement.

*Id.* at 913.

Significantly, these same three cases were cited by the plaintiffs and distinguished by the Circuit in *Angst.* The *Angst* court stated:

> [These] cases are inapposite, as they all involved state law claims that arose at a time when the aggrieved employees were not represented by a union and thus were not subject to collectively bargained labor agreements. By contrast, in the present case the employee's grievances stem from negotiations between [the employer] and their union over a mandatory subject of bargaining—layoffs—which are a condition of employment.

969 F.2d at 1537.

The same concerns are implicated in this case. Unlike *Caterpillar, Berda* and *Malia,* Plaintiffs were members of Local 1412 and were subject to the terms of the Collective Bargaining Unit at the time the alleged independent agreement was entered into. Moreover, as previously discussed, Plaintiffs' grievances concern a subject—the right to reimbursement of litigation liability—which is a term of their Collective Bargaining Agreement and a condition of their employment. Both of these factors distin-

guish *Caterpillar, Berda* and *Malia* from the present case. As stated above, to allow Plaintiffs to contract independently under these circumstances would impermissibly circumvent the collective bargaining process. *N.L.R.B.*, 388 U.S. at 180, 87 S.Ct. at 2006; *Angst*, 969 F.2d at 1536–37; *Riccio*, 1992 WL 281159 at *2, 1992 U.S.Dist.LEXIS 15434 at *4.

Furthermore, Zecca's reliance on *Caterpillar, Berda, Malia, Lingle* and *Allis-Chalmers* misconstrues the holdings in those cases. Unlike the dictum in *Allis-Chalmers* and *Berda*, this is not a case in which the dispute "tangentially involves a provision of a [CBA]." *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911; *Berda*, 881 F.2d at 23. As Zecca concedes, the independent rights claimed by Plaintiffs can be implied from Article 17, *see* Zecca Opp. Brief at 8, and, therefore, directly implicate the Collective Bargaining Agreement.

Similarly, this is not the case described in *Lingle* in which Plaintiffs' claims are "independent" of the Collective Bargaining Agreement and merely require the court to address "precisely the same set of facts ... without interpreting the agreement itself." *Lingle*, 486 U.S. at 409–10, 108 S.Ct. at 1883. As discussed above, Article 17 is drawn in general terms. To determine Plaintiffs' rights under the provision, therefore, requires an analysis of Article 17 and its place in the scheme of the Collective Bargaining Agreement as a whole, as well as a determination of what rights were intended to be covered by Article 17 and how the parties have applied the provision in practice.[21] *Compare Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882 (resolution of state claim required purely factual analysis and no construction of CBA).

Finally, even recognizing that employees subject to a CBA can, in some circumstances, enter into independent contracts

with their employers, does not advance Plaintiffs' position. As the Circuit recognized in *Malia:*

> A logical corollary to the rule preempting state law claims that depend on [CBAs] is the rule that employees who are members of a collective bargaining unit cannot negotiate individual contracts that are inconsistent with the CBA.

794 F.2d at 912 (citing *J.I. Case*, 321 U.S. at 337–39, 64 S.Ct. at 580–81); *accord Chmiel*, 873 F.2d at 1285. Because the scope of Article 17 is ambiguous, the right to attorneys' fees asserted under Plaintiffs' Independent Contract Claims may be inconsistent with the rights intended by the parties to be granted under Article 17.[22] If the two are inconsistent, Plaintiffs are precluded from asserting those inconsistent reimbursement rights. *Id.*

Assuming one step further that the reimbursement rights asserted in Plaintiffs' Independent Contract Claim are consistent with Article 17, a finding of preemption would still be appropriate. As the court stated in *Kern:*

> If employees were free to negotiate and enforce separate ... agreements identical to the [CBAs] under which they labored, and then if they were permitted to enforce these oral agreements under state law, much of the federal concern for swift resolution of disputes through grievance and arbitration procedures, or through immediate court intervention, for consistent interpretation of contract terms would be undermined. Plaintiffs would be free to rely on longer state statutes of limitations, and they would be free to ignore grievance/arbitration procedures. The uniform federal common law growing out of the [LMRA] that courts have been so careful to protect would be circumvented and ineffectual.

---

21. For the same reasons, the following dictum in *Caterpillar* is inapplicable: "[C]laims bearing no relationship to a [CBA] beyond the fact that they are asserted by an individual covered by such an agreement are simply not pre-empted by [Section] 301."

22. Again, it is easy to demonstrate the ambiguity of this situation. While Article 17 obligates Burns to assume, in general terms, "liability" for suits brought against its employees, the Burns Memo indicates that, in practice, Burns has paid for its employees' attorneys' fees. Moving Brief, Ex. A.

*Kern,* 669 F.Supp. at 704; *accord White,* 742 F.Supp. at 319–20 n. 7; *see also Lingle,* 486 U.S. at 411, 108 S.Ct. at 1884 ("central reason" for Section 301 preemption is "the need to preserve the effectiveness of arbitration").

Accordingly, Plaintiffs' Independent Contract Claim must be dismissed as preempted by Section 301.

### 2. *The Promissory Estoppel Claim*

■ Plaintiffs also argue that their Promissory Estoppel Claim exists independently of collective bargaining agreement, in that it (1) is clearer in its application to attorneys' fees than Article 17 and (2) is based on the Burns Memo which allegedly made a "promise" to the Plaintiffs. Zecca further argues: "This is not even remotely a Section 301 claim, because the offer alleged [in the Burns Memo] was expressed directly to the workforce by Burns, was not the product of any negotiation with the [Local 1412], nor did [Local 1412] claim any credit for obtaining this benefit." [23] Zecca Opp. Brief at 12. Finally, Zecca asserts that "[n]o resort whatsoever to the [C]ollective [B]argaining [A]greement is at all necessary to resolve this claim." *Id.*

■ As an initial matter, promissory estoppel is a cause of action closely-related to breach of contract; its purpose is to compensate those who have reasonably relied on the promise of another, although the complete elements of a claim for breach of contract—such as mutual consideration—cannot be made out. *International Minerals & Mining Corp. v. Citicorp. N. Am., Inc.,* 736 F.Supp. 587, 600 (D.N.J.1990); *Ballard v. Schoenberg,* 224 N.J.Super 661, 666, 541 A.2d 258 (App.Div.), *cert. denied,* 113 N.J. 367, 550 A.2d 473 (1988); *Royal Assocs. v. Concannon,* 200 N.J.Super 84, 92, 490 A.2d 357 (App.Div.1985); *see also* 4 Williston on Contracts §§ 8.4–8.6 (4th ed. 1992). Indeed, in this case, Zecca concedes that the Promissory Estoppel Claim "was

pleaded as an alternate to the [Independent Contract Claim] in the event that the [c]ourt or a jury determine[d] that the contract alleged ... was not sufficiently established." Zecca Opp. Brief at 12–13.

■ Plaintiffs' Promissory Estoppel Claim is thus related to the Independent Contract Claim. Both claims arise from the same set of facts, both are based on the same Burns Memo and on the conduct by Burns and both implicate the same provision of the Collective Bargaining Agreement. Accordingly, the same concerns relating to Section 301 preemption are present in both. By necessity, if Plaintiffs' Independent Contract Claim must fail, *inter alia,* because (1) the heart of that claim is embodied in a right created by the Collective Bargaining Agreement, (2) determining the difference between that claim and the reimbursement rights provided by Article 17 requires substantial analysis of the Collective Bargaining Agreement and (3) allowing such a claim would impermissibly circumvent the collective bargaining process and contravene well-established principles of labor law, the Promissory Estoppel Claim must also be dismissed.

■ Claims sounding in both breach of contract and promissory estoppel implicate the same concerns with regard to Section 301. *See Fox v. Parker Hannifin Corp.,* 914 F.2d 795, 801 (6th Cir.1990); *Ulrich,* 884 F.2d at 938; *Bache,* 840 F.2d at 286 n. 1; *Darden v. United States Steel Corp.,* 830 F.2d 1116, 1120 (11th Cir.1987); *see also UAW v. Park–Ohio Indus., Inc.,* 661 F.Supp. 1281, 1304–05 (N.D.Ohio 1987) (applying Section 301 preemption to promissory estoppel claims); *Smith v. Capitol Mfg. Co., Div. of Harsco Corp.,* 626 F.Supp. 110, 112–13 (S.D.Ohio 1985) (same).

In fact, when courts have confronted state law claims for both breach of an independent contract and promissory estoppel in the context of Section 301 preemp-

---

**23.** This argument does not merit significant response. As the Supreme Court has repeatedly held, and as discussed above, Section 301 applies to contracts—and, therefore, to claims related to contracts such as promissory estoppel—between employers and employees. *See supra*

at p. 1182. It has also been established that individual members of a collective bargaining unit are prohibited from independently contracting with their employer concerning a term of their employment which is incorporated in a CBA. *See supra* at pp. 1178–1181.

tion, these courts have often analyzed the preemption question without distinguishing between the contract and promissory estoppel claims. *See, e.g., Fox,* 914 F.2d at 801; *Ulrich,* 884 F.2d at 938; *Berda,* 881 F.2d at 25–26; *Anderson v. Ford Motor Co.,* 803 F.2d 953, 957–59 (8th Cir.1986), *cert. denied,* 483 U.S. 1011, 107 S.Ct. 3242, 97 L.Ed.2d 747 (1987).

The appropriateness of Section 301 preemption on the Promissory Estoppel Claim is also demonstrated by reviewing and analyzing the elements which Plaintiffs must prove to establish a *prima facie* case of promissory estoppel.[24] Under New Jersey law,[25] four separate factual elements must be proved to justify application of the doctrine of promissory estoppel: (1) a clear and definite promise by the promisor, (2) made with an expectation that the promisee will rely on that promise, (3) the promisee must, in fact, reasonably rely on the promise, and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise. *Royal Assocs.,* 200 N.J.Super. at 91–92, 490 A.2d 357; *see also Starr v. JCI Data Processing, Inc.,* 757 F.Supp. 390, 393, *vacated in part on reconsideration,* 767 F.Supp. 633 (D.N.J. 1991); *First Atlantic,* 738 F.Supp. at 877; *Ballard,* 224 N.J.Super at 666, 541 A.2d 258; *Fairken,* 223 N.J.Super at 279–80, 538 A.2d 465; *E.A. Coronis Assoc. v. M. Gordon Constr. Co.,* 90 N.J.Super 69, 74–80, 216 A.2d 246 (App.Div.1966).

For the purposes of Section 301 preemption, the key element of the Promissory Estoppel Claim is the third element—

namely, reasonable reliance. Article 17 sets forth the general terms of Plaintiffs' employment with regard to the reimbursement of legal costs. Because reimbursement is provided for in the Collective Bargaining Agreement and is a term of Plaintiffs' employment, the reasonableness of Plaintiffs' reliance on the specific representation of the Burns Memo and on the White Representations cannot be determined without reference to the Collective Bargaining Agreement and the intent underlying Article 17. This necessity of reference is provided by the Burns Memo itself, which indicates that reimbursement will proceed "as in the past"—*i.e.,* when the only reimbursement rights in existence were provided by Article 17. Moving Brief, Ex.A.

In *Smith,* 943 F.2d 764, the court was faced with a similar question of whether employees had reasonably relied on representations of permanent employment by their employer, where the CBA specifically contained terms regarding re-employment and benefits eligibility. Quoting the district court opinion, the *Smith* court agreed that "the fact finder's evaluation of reasonableness [would] inevitably require it to interpret the terms of the [CBA]." The court observed that

[s]hould this case go to trial ... "the jury would have to put themselves in the position of an 'ordinary' employee covered by the [CBA] and told of these representations. At a minimum, the jury would be forced to read and interpret the provisions of the [CBA] to determine

---

**24.** As a general rule, the preemptive effect of Section 301 depends upon the elements of the state-law cause of action. *Stikes,* 914 F.2d at 1268; *Childers v. Chesapeake & Potomac Tel. Co.,* 881 F.2d 1259, 1262 (4th Cir.1989); *Vacca,* 875 F.2d at 1342; *Barton,* 718 F.Supp. at 1287; *see, e.g., Lingle,* 486 U.S. at 406–07, 108 S.Ct. at 1881–82; *Berda,* 881 F.2d at 27. If any of those elements require construction of the CBA, Section 301 preemption is appropriate. *Stikes,* 914 F.2d at 1268; *see, e.g., Allis–Chalmers,* 471 U.S. at 216–19, 105 S.Ct. at 1913–15 (finding that tort of bad faith handling of insurance claim was derivative of rights established by CBA and, therefore, required construction of CBA and was preempted); *Cole,* 672 F.Supp. at 800–02 (same).

**25.** New Jersey recognizes promissory estoppel as cause of action. *Woolley v. Hoffmann–La Roche,* 99 N.J. 284, 303 n. 9, 491 A.2d 1257 (1985); *Fairken Assocs. v. Hutchin,* 223 N.J.Super. 274, 279, 538 A.2d 465 (App.Div.1987); *Royal Assocs.,* 200 N.J.Super. at 91, 490 A.2d 357; *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank,* 163 N.J.Super. 463, 479, 395 A.2d 222 (App.Div.1978), *cert. denied,* 79 N.J. 488, 401 A.2d 243 (1979); *see also Friedman v. Tappan Devel. Corp.,* 22 N.J. 523, 537, 126 A.2d 646 (1956) (seminal New Jersey case); *First Atlantic Leasing Corp. v. Tracey,* 738 F.Supp. 863, 877 (D.N.J.1990) (applying New Jersey law).

whether a reasonable person would have relied on the representations of permanent employment knowing ... their eligibility for benefits as provided by the [terms of the CBA]."

*Smith,* 943 F.2d at 769 (quoting *Smith v. Colgate-Palmolive Co.,* 752 F.Supp. 273, 279 (S.D.Ind.1990), *aff'd,* 943 F.2d 764 (7th Cir.1991)).

The *Smith* dicta are equally applicable in this case. Put simply, the question becomes whether a reasonable employee, told that his or her attorneys' fees would be paid for by Burns, would have relied on those representations, given Article 17 and the past practice of Burns with regard to Article 17. Because this question cannot be evaluated without substantial analysis of (1) the Collective Bargaining Agreement, (2) the intent behind Article 17 and (3) the reimbursement practices of Burns, Section 301 preemption is relevant.

Accordingly, Plaintiffs' Promissory Estoppel Claim must be dismissed as preempted by Section 301.

## C. The Rule 4 Claim

■ Plaintiffs claim that, under N.J.Rule 4:42–9(a)(6), they are entitled to indemnification of their legal expenses. Plaintiffs argue that Rule 4 creates a substantive right to indemnification, and that this claim is properly before the court pursuant to Rule 46 of the Local Rules of the United States District Court for the District of New Jersey (the "Local Rules") and pursuant to the supplemental jurisdiction of 28 U.S.C. § 1367.

In opposition, Burns argues that N.J.Rule 4:42–9(a)(6) is rule of state court procedure rather than a provision of substantive law. Moving Brief at 12. Therefore, Burns argues, N.J.Rule 4:42–9(a)(6) does not create an independent state law claim and, because the remaining state law claims have been preempted, there is no supplemental jurisdiction for this claim. *Id.;* Reply Brief at 8–9.

N.J.Rule 4:42–9(a)(6) provides that "fee[s] for legal services shall be allowed ... in an action upon a liability or indemnity policy of insurance, in favor of a suc-

cessful claimant." *Id.* The argument of Plaintiffs that N.J.Rule 4:42–9(a)(6) creates a substantive cause of action is meritless. In *Du–Wel Prods., Inc. v. United States Fire Ins. Co.,* 236 N.J.Super. 349, 565 A.2d 1113 (1989), *cert. denied,* 121 N.J. 617, 583 A.2d 316 (1990), the court considered the issue of whether, in an insurance indemnity action governed by Michigan substantive law, N.J.Rule 4:42–9(a)(6) should be applied. *Id.,* 236 N.J.Super. at 362, 565 A.2d 1113. The *Du–Wel* court stated:

It is a virtually axiomatic principle of conflicts of law that the *procedural law* of the forum applies even to causes of action governed by a different jurisdiction's substantive law.... *Court rules regulating attorney fees are not only clearly procedural but also have been so declared. See Busik v. Levine,* 63 N.J. 351, 372–73 [307 A.2d 571] (1973) [, *appeal dismissed,* 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973)], in which Chief Justice Weintraub explained that the subject of counsel fees, despite its substantive dollar impact on litigants, "has been consistently held to be one of practice and procedure within the constitutional grant of power to the [New Jersey] Supreme Court." ... [W]e do not think it appropriate to foreclose any litigant who properly seeks *redress in our courts,* whether or not a resident and whether or not our substantive law applies, from the full scope of remedies affordable by our court rules. This jurisdiction views its counsel-fee rules as inextricably bound to the question of *access to our courts. They are thus procedural in a fundamental sense....*

*Id.,* 236 N.J.Super. at 362–63, 565 A.2d 1113; *see also Urban League v. Carteret,* 115 N.J. 536, 554, 559 A.2d 1369 (1989) (distinguishing between "motions for attorney's fees" and claims for "substantive redress"); *State v. Otis Elevator Co.,* 12 N.J. 1, 5, 95 A.2d 715 (1953) (stating that "[f]rom the outset in New Jersey, following English precedents, the allowance of costs and counsel fees had been uniformly considered by the courts of this State to be

a matter of procedure rather than of substantive law").

The Third Circuit has also rejected the argument that N.J.Rule 4:42–9(a)(6) is anything more than a rule of procedure governing the administration of New Jersey state courts. In *First State Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co.*, 803 F.2d 1308 (3d Cir.1986), the court reviewed a district court decision applying Pennsylvania state substantive law and the New Jersey rule on attorneys' fees under N.J.Rule 4:42–9(a)(6). The *Travelers* court stated:

> In considering the question whether to apply Pennsylvania or New Jersey law to the issue of attorney's fees, the district court concluded that a court rule relating to counsel fees is a hybrid of procedural and substantive law. In view of the hybrid nature of this rule and, more significantly, because of the policy considerations underlying its adoption, the district court concluded that New Jersey law should apply to the counsel fee issue "even though Pennsylvania law was rightly applied on the more substantive contractual issues involved in the case."
>
> We find the district court erred as matter of law in (1) applying New Jersey law to the issue of counsel fees and (2) awarding those fees to Travelers and Certain–Teed. *The district court's hybrid rationale is untenable;* there is simply no case law to support the proposition that, while some issues raised in a diversity action to resolve the rights and liabilities of parties under an insurance policy are subject to the substantive law of one state, the counsel fee issue may be properly decided on the basis of the *procedural law* of another state. Thus, it is the law of Pennsylvania and not the law of New Jersey, that governs the award of attorney's fees in this case.

*Id.* at 1315–16 (emphasis added).

That N.J.Rule 4:42–9(a)(6) is a procedural rule rather than a separate, substantive cause of action is further supported by the very provisions which establish and govern the Rule. For instance, N.J.Rule 4:1 specifically provides that the Rules contained in Part IV of the New Jersey Court Rules, including N.J.Rule 4:42–9(a)(6), are designed to be procedural in nature. N.J.Rule 4:1 provides: "The Rules in Part IV, insofar as applicable, govern the *practice and procedure* of civil actions in the Superior Court, Law and Chancery Divisions, and the surrogate's courts and Tax Court ..." N.J.Rule 4:1.

More significantly, the New Jersey Supreme Court has long held that its power to create rules governing the courts of New Jersey, as provided by Article VI, section 2, paragraph 6 of the New Jersey State Constitution,[26] is limited to matters of court practice and procedure, and does not empower it to create substantive law or rights. *Sattelberger v. Telep*, 14 N.J. 353, 363, 102 A.2d 577 (1954); *George Siegler Co. v. Norton*, 8 N.J. 374, 381, 86 A.2d 8 (1952); *see also Winberry v. Salisbury*, 5 N.J. 240, 247–48, 74 A.2d 406, *cert. denied*, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950) ("The distinction between substantive law, which defines our rights and duties, and the law of pleading and practice, through which such rights and duties are enforced in the courts, is a fundamental one.... [Courts] are not to make substantive law wholesale through the exercise of their rule-making power.").

For instance, in *Busik v. Levine*, 63 N.J. 351, 307 A.2d 571 (1973), the New Jersey Supreme Court stated:

> Defendants point out that the rule-making power granted the [New Jersey] Supreme Court in Art. VI, § 2, ¶ 3, relates to "practice and procedure," and from this grant defendants would infer that this constitutional provision inferentially dictates the mode whereby the Supreme court may make "substantive" law. But the constitutional provision is what it purports to be—a grant of power with respect to "practice and procedure." It does not purport to deal with substantive

---

**26.** Revised in 1947, the New Jersey State Constitution provides in relevant part: "The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practices and procedure in all such courts." N.J. Const. art. VI, § 2, ¶ 3 (1947).

law or to prescribe a format for the discharge of the Court's responsibility as to that topic.

*Id.* at 361–62, 307 A.2d 571; *see also State v. Leonardis,* 73 N.J. 360, 374, 375 A.2d 607 (1977) (recognizing "long-standing rule that the Court is not to invade the Legislature's domain" by making substantive law through its rule-making power) (citing *Winberry,* 5 N.J. at 248, 74 A.2d 406).

■ Despite the fact that N.J.Rule 4:42–9(a)(6) cannot, by itself, provide a substantive cause of action subject to supplemental federal jurisdiction, courts have indicated that occasions exist when the rule can be applied in federal court. In *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750 (3d Cir.1990), the court stated that "[s]tate rules concerning the award or denial of attorney's fees are to be applied in cases where federal jurisdiction is based on diversity or if the court is exercising pendent [now supplemental] jurisdiction." [27] *Id.* at 775 n. 47; *see also Transamerica Ins. Co. v. Keown,* 472 F.Supp. 306, 312 (D.N.J.1979) (applying N.J.Rule 4:42–9(a)(6) in diversity action).

In the case at bar, neither of these conditions are met. Jurisdiction in this case is founded upon federal question jurisdiction under 28 U.S.C. § 1331 and the specific statutory grant of jurisdiction provided by Section 301 of the LMRA, 29 U.S.C. § 185(a). Because Leonardis, Zecca and Burns are all residents of New Jersey, *see supra* at p. 1168, no diversity jurisdiction is even possible. *Cf. Transamerica Ins. Co. v. Keown,* 85 F.R.D. 120, 128 (D.N.J.1980) (applying N.J.Rule 4:42–9(a)(6) in diversity action but only as to fees incurred in federal court action to recover indemnity policy; not allowing fees incurred in separate state court litigation).

■ Similarly, there is no basis for the exercise of supplemental jurisdiction in this case. Because both of Plaintiffs' state law claims—the Independent Contract Claim and the Promissory Estoppel Claim—have been found to be preempted by Section 301, the sole remaining claim in the Complaint is Plaintiffs' Section 301 Claim, a federal cause of action. As the Circuit suggested in *Travelers,* it is an error of law to apply N.J.Rule 4:42–9(a)(6)—a New Jersey state procedural rule—to a non-New Jersey cause of action.[28] *Travelers,* 803 F.2d at 1316.

■ Because Plaintiffs' state law claims have been preempted and because, as stated above, N.J.Rule 4:42–9(a)(6) does

---

**27.** The *McAdam* court added that those state rules regarding attorneys' fees could not be applied in federal court if their application would "run counter to federal statutes or policy considerations." 896 F.2d at 775 n. 47.

**28.** Although *Travelers* involved the application of the New Jersey procedural rule with Pennsylvania substantive law, the rationale in not permitting N.J.Rule 4:42–9(a)(6) to be applied in conjunction with a federal cause of action is the same. In fact, to allow such an application would appear to violate the constitutional rule that in federal court actions with federal question jurisdiction, federal rules of procedure are followed. *New Jersey v. Kinder,* 701 F.Supp. 486, 488 (D.N.J.1988); *Watson v. Manhattan & Bronx Surface Trans. Operating Auth.,* 487 F.Supp. 1273, 1276 (D.N.J.1980); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir.1989) (even where cause of action is state created, federal rules of civil procedure apply).

Moreover, Plaintiffs' argument that Rule 46 of the Local Rules allows for the recovery of attorneys' fees is meritless. Local Rule 46 sets forth the procedure which must be followed by an *"attorney* seeking compensation for services or reimbursement of necessary expenses." Local Rule 46. As an initial matter, Plaintiffs have not demonstrated that they are proper parties to seek to seek attorneys' fees under Local Rule 46.

In addition, by its own terms, Local Rule 46 applies only in those actions "in which a counsel fee is allowed by the Court or permitted by statute." Local Rule 46 (emphasis added). As previously discussed, N.J.Rule 4:42–9(a)(6), on which Plaintiffs rely, is a rule of procedure created by the New Jersey Supreme court. In contrast, by use of the word "statute," Local Rule 46 appears to apply to legislative initiatives which grant a substantive right to recover attorneys' fees. Stated simply, Plaintiffs have failed to demonstrate that N.J.Rule 4:42–9(a)(6) is "statute" within the meaning of Local Rule 46.

Finally, as discussed above as well, Plaintiffs have failed to demonstrate that N.J.Rule 4:42–9(a)(6) can be applied in this case. As indicated, Plaintiff has provided no authority to support the application of a state procedural rule in a federal question case in federal court. Thus, Plaintiffs' interpretation of Local Rule 46 appears to be incorrect.

not create a substantive cause of action or its own basis for supplemental jurisdiction,[29] the rule cannot be applied in this federal question cause of action. Accordingly, Plaintiffs' Rule 4 claim must be dismissed.

### Conclusion

For the reasons set forth above, the Burns motion for partial summary judgment is granted in its entirety.

---

**29.** Even if Plaintiffs' contention is accepted and it is assumed that Rule 4:42–9(a)(6) provides a substantive cause of action, it does not appear that Plaintiffs have satisfied the summary judgment standard with regard to that cause of action. First, as pointed out by Burns, there is no liability or indemnity *policy of insurance* in this case. Second, "the intention of the Rule is to permit an award of counsel fees *only* where an insurer refuses to indemnify or defend its insured's third-party liability to another." *Guarantee Ins. Co. v. Saltzman,* 217 N.J.Super. 604, 610–11 (App.Div.1987) (emphasis added). Plaintiffs have incurred no third party liability to another person. They have neither been the subject of a separate civil action nor have they had a damages judgment rendered against them. Third, Rule 4:42–9(a)(6) "generally ... is not extended to permit counsel fees to an insured on a direct suit against the insurer to enforce a casualty or other first-party coverage." *Guarantee Ins.,* 217 N.J.Super. at 611 (citing multiple additional cases); *see also Oritani S & L Ass'n v. Fidelity & Deposit Co.,* 744 F.Supp. 1311, 1320 n. 11 (D.N.J.1990). Put simply, Plaintiffs claim against Burns concerns first-party coverage. As such, it does not appear to be the kind of suit intended to be covered by Rule 4:42–9(a)(6).